

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-21-2003

# Atkinson v. Taylor

Precedential or Non-Precedential: Precedential

Docket 01-2955

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Atkinson v. Taylor" (2003). *2003 Decisions.* Paper 820.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/820

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 21, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2955

ROGER ATKINSON

v.

STANLEY TAYLOR, Commissioner;
RAPHAEL WILLIAMS, Warden; PERRY PHELPS, Major;
BRADLEY LEE, Captain; PARKER, Sgt.; FRED WAY,
C/O, in his individual and official capacity;
STATE OF DELAWARE DEPARTMENT OF CORRECTIONS;
ANDRE GREEN, Cpl., in his/her individual and
official capacity,
        Appellants

Appeal from the United States District Court
for the District of Delaware
(C.A. No. 99-cv-562)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued
April 18, 2002

Before: NYGAARD and AMBRO, Circuit Judges,
and O'NEILL, District Judge*

(Filed: January 21, 2003)

_____

* Honorable Thomas N. O'Neill, Jr., Senior District Judge for the United
States District Court for the Eastern District of Pennsylvania, sitting by
designation.


        Gregory E. Smith (Argued)
        Stuart B. Drowos, Esq.
        Deputy Attorney General
        Carvel State Building, 6th Floor
        820 North French Street
        Wilmington, Delaware 19801
         Counsel for Appellants

        Richard H. Morse (Argued)
        Young, Conaway, Stargatt &
         Taylor, LLP
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, DE 19899
         Counsel for Appellee

OPINION OF THE COURT

O'NEILL, District Judge:

This is an appeal from the District Court's denial of appellants' motion for summary judgment based on qualified immunity. Appellee, an inmate of the Delaware Department of Correction, asserted civil rights infractions under 42 U.S.C. S 1983, claiming that appellants 1) violated the Eighth Amendment's prohibition on cruel and unusual punishment by exposing him to environmental tobacco smoke ("ETS") that created a serious medical need and posed an unreasonable risk of harm (Count I) and 2) retaliated and used excessive force against him for filing his ETS lawsuit (Counts III and IV). Appellants1 raise three issues on appeal: 1) whether appellants are entitled to qualified immunity for the ETS claims; 2) whether appellants are entitled to qualified immunity on the

_____

1. The appellants are Stanley Taylor (Commissioner of the Department of Correction), Warden Raphael Williams, Major Perry Phelps, Sergeant Phillip Parker, Correctional Officer Fred Way, and Corporal Andre Green. All ranks are those held by appellants at the time of filing of the complaint.

2

retaliation and excessive force claims; and 3) whether appellants in supervisory positions are entitled to qualified immunity on all claims because they lacked notice of the underlying events. As to the first two issues, we will affirm the District Court's denial of summary judgment. We conclude that we lack jurisdiction to decide the third issue.

I. BACKGROUND2

Appellee Roger Atkinson is a blind, diabetic prisoner who was housed at Delaware's Multi-Purpose Criminal Justice Facility ("MPCJF "). Although a former one-pack-per-day smoker, appellee quit in 1995 after receiving surgery for a pituitary adenoma.

Atkinson's ETS claims arise under the Eighth and Fourteenth Amendments of the United States Constitution. He asserts that from November, 1998, until November, 1999, appellants subjected him to cruel and unusual punishment by exhibiting deliberate indifference to his claims that he was being involuntarily exposed to high levels of second-hand smoke, which forced him to endure severe allergic reactions to ETS and posed an unreasonable risk of future harm to his health. According to his answers to interrogatories, during a seven-month incarceration at MPCJF he shared a cell with two inmates, each of whom smoked "constantly" while in the cell. Appellee shared another cell with a constant smoker for six weeks, and later with a cellmate who smoked ten cigarettes per day. Appellee also claims that he has been exposed to other smoking cellmates on various occasions.

Shortly after being exposed to ETS and suffering symptoms from it, appellee complained to the medical staff

at MPCJF and Sergeant Sonata. Atkinson alleges that when he tried to seek help at the prison infirmary, the treating nurse responded that she was unable to transfer him to a cell with a nonsmoking roommate. Although Sonata moved appellee to a smoke-free area, Way later returned him to a smoking environment. Thereafter appellee wrote letters to Williams, Captain Lee, Phelps, Parker, and Taylor about his exposure to ETS. The exposure did not cease.

_____

2. We accept the facts as the District Court stated them in its opinion.

Appellee twice complained to Parker, the supervisor of Pods 1F and 1E, about his exposure to ETS, but Parker refused to move him to a smoke-free area. Appellee also complained to Green and requested that he be removed from exposure but was not moved.

Atkinson's amended complaint alleges that he was exposed, with deliberate indifference, to constant smoking in his cell for over seven months and as a result suffered nausea, an inability to eat, headaches, chest pains, difficulty breathing, numbness in his limbs, teary eyes, itching, burning skin, dizziness, a sore throat, coughing and production of sputum. Albert A. Rizzo, M.D., a pulmonary specialist who examined appellee concluded that there was a "reasonable medical probability" that these symptoms were precipitated by second-hand smoke. However, in an affidavit, prison physician Dr. Keith Ivens disputed Dr. Rizzo's evaluation and contended that Atkinson's symptoms arose from seasonal allergies. A. Judson Wells, Ph.D. stated in an expert report:"I would say that for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death or non-fatal heart attack or stroke."

Appellee also asserts that MPCJF officials subjected him to a variety of abuses in retaliation for filing his lawsuit. He contends that Way told him that if he had not complained about ETS he would not have been placed in administrative segregation. On repeated occasions, Way read appellee's personal mail over the prison's intercom so that other inmates could hear it. On or before May 4, 2000, notes relating to appellee's ETS case were taken from his cell and were read over the intercom by Way and Officer Johnson. Way withheld papers that appellee requested from the law library. On other occasions, Way refused to permit appellee to make telephone calls to his attorney. Way also cursed appellee and made derogatory comments about his blindness. When appellee asked Way to stop harassing him, Way again cursed him and stated that Way was above the law. Parker was aware of these actions but failed to stop them. Way and Parker placed appellee in solitary confinement during recreation periods, thereby depriving him of the assistance of people able to read his mail or help

him with legal work, allegedly for the purpose of preventing him from proceeding with his civil action. On October 5, 2000, Way prevented appellee from receiving his one hour of recreation and falsely wrote in the prison log that he had refused recreation.

Additionally, appellee either received or was threatened with physical retaliation for filing his lawsuit. In January or February of 1999, Way entered appellee's cell while he was sleeping, grabbed him by the leg and pulled appellee from his bed, stating that he thought appellee was dead. On March 29, 2000, Way threatened to attack appellee and took appellee's clothing, leaving appellee without clothing for over ten hours. On another occasion, Way entered appellee's cell and threatened to smash his face into the wall. Another time, Way stated that he would hang appellee. On multiple occasions, Way prevented appellee from receiving his medications or tampered with his food. Way and Parker have threatened appellee and told him that he would never make it to court. Various times Way told appellee that Way would "kick [his] ass," that his privileges would be taken away, and that there was nothing that he could do about it. On December 26, 2000, appellee was attacked by Green, who struck him in the face and head. This incident was investigated by the FBI, apparently because of complaints made by appellee's mother. Thereafter, Way told appellee over the intercom that he would regret bringing the FBI into the matter and that Way would make him pay. When appellee was leaving an interview room Way ordered appellee to take off his clothing. After appellee disrobed, Way kicked his clothing around and said that he had to make sure that appellee was not a woman because women were sent to another facility. On December 27, 2000, Green refused to bring appellee his breakfast and lunch trays. On February 16, 2001, when appellee returned from a court appearance, he was strip searched in booking, which is standard procedure. Appellee then returned to Pod 1F and for no reason Way made him strip again.

According to appellee, he has written to Williams, Phelps, Taylor, and Parker, and spoken to Green, about the harassment he received from Way.

5

II. STANDARD OF REVIEW

Review by this Court is plenary when a denial of qualified immunity turns solely on a question of law. Brown v. Armenti, 247 F.3d 69, 72 (3d Cir. 2001). We recently reiterated that this Court lacks jurisdiction to evaluate the sufficiency of the evidence when reviewing a denial of summary judgment based on a lack of qualified immunity. Walker v. Horn, 286 F.3d 705, 710 (3d Cir. 2002) ("[W]e must adopt the facts assumed by the District Court."); see also Johnson v. Jones, 515 U.S. 304, 319 (1995) (no

interlocutory appeal from denial of summary judgment based on remaining genuine issues of material fact). Although we may not evaluate the sufficiency of the evidence to prove the facts allegedly giving rise to a constitutional claim, we may determine whether the facts identified by the District Court constitute a violation of a clearly established constitutional right. See Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d. Cir. 2002).

III. QUALIFIED IMMUNITY

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court explained the two-part inquiry a court must make in order to determine whether a state official is entitled to qualified immunity:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . .
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

Id. at 201.

To be clearly established "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Saucier Court further explained the latter prong of the test:

> This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable . . . .
>
> This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have agreed upon the precise formulation of the standard. Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.

Saucier, 533 U.S. at 201, 203.

A. The ETS claims

Atkinson asserts two separate Eighth Amendment claims
against defendants stemming from his involuntary exposure
to ETS: 1) a claim for potential future harm arising from his
exposure to ETS; and 2) a present injury claim stemming
from deliberate indifference to existing medical needs
caused by ETS. We will sequentially address whether
defendants are entitled to qualified immunity for each
claim.

1. Future Injury Claim

With respect to the future injury claim, Helling v.
McKinney, 509 U.S. 25 (1993), established the
constitutional right required by the first prong of the
Saucier test for qualified immunity. In Helling, the Supreme
Court determined that a cause of action exists under the
Eighth Amendment when a prisoner alleges that prison
officials have exposed him, with deliberate indifference, to
levels of ETS that pose an unreasonable risk of harm to his

7

future health. Id. at 35 (concluding that prisoner stated a
claim where he was forced to share a cell with a five-pack-
per-day smoker). As to the second part of the Saucier
inquiry, the Helling Court clearly established the elements
of a two-part test that a plaintiff must meet to state a valid
claim under the Eighth Amendment.

The Court explained that the first prong of the Helling
test is an objective one: "[The prisoner] must show that he
himself is being exposed to unreasonably high levels of
ETS." Id. at 35. With respect to the objective factor, the
Court noted that beyond a scientific and statistical inquiry
into the seriousness of the potential harm and the
likelihood that such injury to health will actually be caused
by exposure to ETS, the Eighth Amendment requires "a
court to assess whether society considers the risk that the
prisoner complains of to be so grave that it violates
contemporary standards of decency to expose anyone
unwillingly to such a risk." Id. at 36 (emphasis in original).
The Court stated: "In other words, the prisoner must show
that the risk of which he complains is not one that today's
society chooses to tolerate." Id.

The second prong of the Helling test is a subjective one:
whether prison officials were deliberately indifferent to a
serious risk of harm. Id. at 36. The Supreme Court has
held that "a prison official cannot be found liable under the
Eighth Amendment for denying an inmate humane
conditions of confinement unless the official knows of and
disregards an excessive risk to inmate health or safety; the
official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious
harm exists, and he must also draw the inference." Farmer

v. Brennan, 511 U.S. 825, 837 (1994).

In concluding, the Helling Court held that the prisoner
had properly claimed that the level of ETS to which he was
exposed unreasonably endangered his future health.
Helling, 509 U.S. at 35. The Court remanded the case so
that the prisoner could attempt to prove the objective and
subjective elements necessary to establish a violation of the
Eighth Amendment. Id.

Since 1993, almost every Court of Appeals that has

addressed this issue has recognized that a prisoner's right
to be free from levels of ETS that pose an unreasonable risk
of future harm was clearly established by Helling.3 See
Alvarado v. Litscher, 267 F.3d 648, 653 (7th Cir. 2001)
(affirming District Court's denial of Rule 12(b)(6) motion to
dismiss based on qualified immunity where a prisoner
asserted that ETS exacerbated severe chronic asthma);
Warren v. Keane, 196 F.3d 330, 333 (2d Cir. 1999) (denying
prison officials' motion for summary judgment based on
qualified immunity in an ETS case); Whitley v. Hunt, 158
F.3d 882, 887-88 (5th Cir. 1998) (concluding ETS claim
was wrongly dismissed as frivolous where prison doctor
issued report noting that prisoner required nonsmoking
quarters), overruled on other grounds by Booth v. Churner,
532 U.S. 731, 735 (2001); Rochon v. City of Angola,
Louisiana, 122 F.3d 319, 320 (5th Cir. 1997) (affirming
District Court's denial of a Rule 12(b)(6) motion to dismiss
based on qualified immunity where prisoner asserted that
he was forced to live and work in an environment filled with
tobacco smoke, even though the smoke had not yet harmed
his health but allegedly posed a threat to his health in the
future); Jacobs v. Young, No. 94-3241, 1995 WL 150402, at
**2 (6th Cir. April 5, 1995) (unpublished opinion)
(concluding prisoner's right to be free from harmful levels of
ETS was clearly established in 1993); see also Weaver v.
Clarke, 45 F.3d 1253, 1256 (8th Cir. 1995) (affirming
District Court's denial of a Rule 12(b)(6) motion to dismiss
based on qualified immunity where a prisoner alleged

_____

3. Instead of relying upon cases that directly deal with the question of
whether prison officials should be afforded qualified immunity in ETS
suits, the dissent cites to cases which in our view are inapplicable. See
Henderson v. Sheahan, 196 F.3d 839, 853 (7th Cir. 2000); Oliver v.
Deen, 77 F.3d 156, 159 (7th Cir. 1996). The Henderson and Oliver
Courts did not consider the issue of qualified immunity but affirmed
grants of summary judgment to the defendants based on a lack of
evidence. See Henderson, 196 F.3d at 853; Oliver, 77 F.3d at 159.
Moreover, in a later case the Court of Appeals for the Seventh Circuit
arguably made the strongest ruling that ETS claims are clearly
established for the purposes of qualified immunity:"Given the decision
in Helling, the right of a prisoner to not be subjected to a serious risk of
his future health resulting from ETS was clearly established in 1998-99."
Alvarado v. Litscher, 267 F.3d 648, 653 (7th Cir. 2001).

severe headaches, dizziness, nausea, vomiting, and
breathing difficulties from rooming with "heavy smoker");
but see Mills v. Clark, No. 99-6334, 2000 WL 1250781, at
**4 (4th Cir. Sept. 5, 2000) (unpublished opinion) (reversing
District Court's denial of qualified immunity on summary
judgment for prison officials because it was not clearly
established level of ETS in dormitories posed any
unreasonable risk of future harm).4

In a case identical in facts and procedural posture to the
present one, the Court of Appeals for the Second Circuit
held that a District Court correctly denied prison officials'
summary judgment motion based on qualified immunity
where prisoners claimed to be suffering from sinus
problems, headaches, dizziness, nausea, shortness of
breath, chest pains and asthma from cellmates' smoking in

---

4. The dissent distinguishes ETS cases that survive a motion to dismiss
from those involving a denial of summary judgment by noting that the
former require no evidentiary support for a plaintiff 's claims: "motions to
dismiss [are submitted at] a much easier stage to survive than summary
judgment because, unlike summary judgment, motions to dismiss
require no evidentiary support for the plaintiffs' claims." In making this
argument the dissent appears to be evaluating the underlying evidence.
This is the exercise that Ziccardi forbids us from undertaking on this
appeal:

> As we understand Johnson, if a defendant in a constitutional tort
> case moves for summary judgment based on qualified immunity and
> the district court denies the motion, we lack jurisdiction to consider
> whether the district court correctly identified the set of facts that the
> summary judgment record is sufficient to prove; but we possess
> jurisdiction to review whether the set of facts identified by the
> district court is sufficient to establish a violation of a clearly
> established constitutional right.

288 F.3d at 61; see also Sanders v. Brundage, 60 F.3d 484, 487-88 (8th
Cir. 1995) (refusing to consider "insufficient evidence" argument on
appeal from denial of qualified immunity on a motion for summary
judgment for prisoner's ETS claim). The present appeal from appellants'
denial of summary judgment, however, is interlocutory in nature and
based on a denial of qualified immunity. Because the Supreme Court's
ruling in Johnson prevents us from weighing the evidence, the present
case is more analogous to a 12(b)(6) motion, where we would not
evaluate the underlying evidence to support the plaintiff 's claims which
the District Court chose to accept. See Ziccardi , 288 F.3d at 61.

Sing Sing prison. Warren, 196 F.3d at 333. The Warren
Court held that after Helling "it was clearly established that
prison officials could violate the Eighth Amendment
through deliberate indifference to an inmate's exposure to
levels of ETS that posed an unreasonable risk of future
harm to the inmate's health."5Id. Moreover, the Warren

Court concluded that it would be unreasonable for prison officials to believe that they were not violating the prisoners' Eighth Amendment rights where the District Court determined that "[p]laintiffs' allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, inter alia, under-enforcement of inadequate smoking rules, overcrowding of inmates, and poor ventilation." Id.

In the present case, without weighing the underlying evidence with respect to Atkinson's claim, we conclude that appellants are not entitled to qualified immunity on the ETS claim of future harm. As the Warren Court recognized, the Helling decision established the constitutional right required by the first prong of the Saucier test. Warren, 196 F.3d at 333; see also Helling, 509 U.S. at 35. Atkinson invokes the constitutional right claimed by the Helling prisoner: alleging that he was unwillingly exposed to levels of ETS that pose an unreasonable risk of future harm.

Similarly, Atkinson has satisfied the second prong of the Saucier test. The right recognized by the Helling decision is "clearly established" so that a reasonable prison official would know when he is violating that right. See, e.g., Alvarado, 267 F.3d at 653 ("Given the decision in Helling, the right of a prisoner to not be subjected to a serious risk of his future health resulting from ETS was clearly established in 1998-99."); Warren, 196 F.3d at 333 ("We

---

5. The dissent characterizes Warren as a cursory opinion lacking persuasive value that is not binding on this Court. However, the dissent fails to acknowledge that Warren is directly on-point. See Warren, 196 F.3d at 333 ("We hold that after Helling, it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."). The facts and procedural posture of the Warren decision, a denial of qualified immunity on summary judgment, are a carbon copy of the present case.

11

hold that after Helling, it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."). The facts of Helling are similar to the facts presented by the appellee. In Helling a prisoner was housed with a five-packs-per-day smoker and complained of "certain health problems." Id. at 28. Here, appellee Atkinson was housed for over seven months with "constant" smokers.

As to future harm Atkinson has offered some proof for each element of the alleged Eighth Amendment violation: 1) evidence that he was exposed to unreasonably high levels of ETS, the risk of which is not one that today's society chooses to tolerate; and 2) evidence that prison officials knew of and disregarded an excessive risk to his health or

safety. As to the first element, appellee's deposition and interrogatory answers state that he was subjected to continuous smoking for at least seven months. Demonstrating a risk of future harm, A. Judson Wells, Ph.D. provided statistics and opined in his expert report that "for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death or non-fatal heart attack or stroke." With respect to the causal link between ETS and appellee's symptoms, Dr. Rizzo's letter concluded that there was a "reasonable medical probability" that appellee's symptoms (itchy and burning eyes, chest pains, a sore throat, a persistent cough with sputum production, paroxysms of coughing and resulting headaches) were precipitated by second-hand smoke. Although other Courts of Appeals have affirmed a grant of summary judgment to prison officials on similar evidence as "too speculative,"[6] we

_____

6. For an example, see Henderson, 196 F.3d at 853. The procedural posture of Henderson, an appeal from a grant of summary judgment to prison officials for lack of evidence of future harm, allowed the Court of Appeals to evaluate the sufficiency of the evidence. See id. If appellee can produce evidence of future harm, he may be able to recover monetary damages. See Fontroy, 150 F.3d at 244. However, the problematic quantification of those future damages is not relevant to the present inquiry concerning whether the underlying constitutional right was clearly established so that a reasonable prison official would know that

12

are deciding the issue of qualified immunity, and cannot evaluate the sufficiency of the evidence. See Johnson, 515 U.S. at 319. In addition, appellee has presented evidence that society has become unwilling to tolerate the imposition on anyone of continuous unwanted risks of second-hand smoke, citing Executive Order 71, in which the Governor of Delaware banned smoking in state buildings except in certain designated areas.[7] As to the second Helling element, defendants' answers to Atkinson's interrogatories and the depositions of Way, Phelps, and Parker demonstrate that appellants knew tobacco smoke was dangerous. Additionally, the District Court relied upon Atkinson's statements that he either spoke or wrote to all appellants regarding unreasonable ETS he was experiencing.

2. Present Injury Claim

Atkinson's present injury claim for ETS exposure also is grounded in a clearly established constitutional right. Although Helling dealt only with prisoner's risk of future harm, the Supreme Court clearly established the framework

_____

he subjected appellee to the risk of future harm. Moreover, even if appellee is unable to establish a right to compensatory damages, he may be entitled to nominal damages. See Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 (3d Cir. 2001) ("Where a constitutional deprivation has not caused actual injury, an award of nominal damages may be appropriate.").

7. The dissent characterizes this reference as an attempt to form a societal consensus from a single state regulation. However, we refer to the regulation merely to show that Atkinson has offered some proof of a societal consensus. Proof of a national consensus might include, inter alia, the federal regulation which protects the public and federal employees from ETS in all federal workplaces:

> Pursuant to Executive Order 13058, "Protecting Federal Employees and the Public From Exposure to Tobacco Smoke in the Federal Workplace" (3 CFR, 1997 Comp., p. 216), it is the policy of the executive branch to establish a smoke-free environment for Federal employees and members of the public visiting or using Federal facilities. The smoking of tobacco products is prohibited in all interior space owned, rented, or leased by the executive branch of the Federal Government, and in any outdoor areas under executive branch control in front of air intake ducts.

41 CFR S 101-20.105-3(a).

13

for analyzing claims of present harm in Estelle v. Gamble, 429 U.S. 97 (1976). See Weaver, 45 F.3d at 1256. In Weaver, a case directly on-point, the Court of Appeals for the Eighth Circuit held that Estelle clearly established that prison officials could not be deliberately indifferent to a prisoner's existing serious medical needs caused by ETS. Id. at 1256. In affirming the District Court's denial of qualified immunity to the prison officials the Weaver Court stated, "Such claims were first recognized by the Supreme Court almost two decades ago." Id. at 1256.

In Estelle, the Supreme Court concluded that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, which violates the Eighth Amendment. 429 U.S. at 104. The Estelle Court recognized that even in less serious cases, where the prisoner does not experience severe torment or a lingering death, the infliction of unnecessary suffering is inconsistent with standards of decency. See id. at 103. Specifically, the Supreme Court stated:"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." Id. at 106.

Atkinson has alleged a serious medical need to which appellants were deliberately indifferent. As this Court explained in Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987),"The standard enunciated in Estelle is two-pronged: '[i]t requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious.' " Id. at 346, quoting West v. Keve, 571 F.2d 158, 162 (3d 1978). Although this Court has defined a medical need as serious if it has been diagnosed by a physician as requiring treatment, we also have recognized: "Estelle makes clear that if 'unnecessary and wanton infliction of pain,' . . .

results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment." Id. at 347. Needless suffering resulting from a denial of simple medical care, which does not serve any penological

14

purpose, is inconsistent with contemporary standards of decency and thus violates the Eighth Amendment. See id.

In Weaver, the Court of Appeals for the Eighth Circuit specifically recognized that severe headaches, dizziness, nausea, vomiting, and breathing difficulties stemming from exposure to ETS constituted a serious medical need, which required removal of the prisoner from a smoking environment under the Eighth Amendment. Id. at 1254. Similarly, other Courts of Appeals have recognized that an illness arising from an inmate's exposure to ETS can constitute a serious medical condition. See, e.g., Alvarado, 267 F.3d at 651 ("[Prisoner]'s complaint stated an Eighth Amendment claim when he alleged that because of the prison officials' deliberate indifference, he was being exposed to levels of ETS which aggravated his chronic asthma, thereby endangering his existing health, a claim recognized as an Eighth Amendment violation twenty-five years ago in Estelle v. Gamble . . . ."); 8 Hunt v. Reynolds,

_____

8. The dissent points out that the Seventh Circuit decisions of Henderson and Oliver rejected present injury claims similar to Atkinson's because the prisoners in those cases were unable to prove that their medical needs were sufficiently serious. See Henderson , 196 F.3d at 846; Oliver, 77 F.3d at 161. Again, in our view the dissent engages in the sort of evidence weighing that we are forbidden from undertaking by Johnson, 515 U.S. at 313. See Ziccardi, 288 F.3d at 61; see also Sanders, 60 F.3d 487-88 (refusing to consider "insufficient evidence" argument on appeal from denial of qualified immunity on motion for summary judgment for prisoner's ETS claim). Moreover, the Oliver Court did not conclude that such symptoms were insufficiently serious as a matter of law. See Oliver, 77 F.3d at 161 ("On this record, Oliver has not demonstrated that he was subjected to cruel and unusual punishment."). As the dissent in Oliver clearly explained, the entire panel agreed that the prisoner's allegations (which are similar to Atkinson's) satisfied the requirements of Estelle:

    No one disputes that Oliver's allegations were enough to satisfy Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), Farmer and the other Eighth Amendment cases. Both here and in the lower court the issue has been instead whether there were disputed issues of fact. Viewed in this light, it is clear that there is a material dispute of fact about the severity of Oliver's asthma problem, which in turn raises a material dispute of fact about

15

974 F.2d 734, 735-36 (6th Cir. 1992). The Hunt Court determined that:

> "Medical consequences of tobacco smoke do not differ
> from other medical problems. Prisoners allergic to the

---

> whether the prison officials were deliberately indifferent to his
> serious medical needs.

Oliver, 77 F.3d at 161 (Wood, J., dissenting) (emphasis in original). Although the Court of Appeals found the Henderson prisoner's allegations insufficient as a matter of law, we believe it is clear that breathable air that will not constantly subject a susceptible prisoner to severe allergic reactions is the sort of "minimal civilized measure of life's necessities" that the Eighth Amendment protects. See Farmer, 511 U.S. at 834. Therefore, we refuse to hold as a matter of law that Atkinson's symptoms were insufficiently serious.

The dissent cites to other decisions to support its general proposition that the tide has turned against ETS claims in the Courts of Appeals. See Richardson v. Spurlock, 260 F.3d 495, 499 (5th Cir. 2001) (affirming District Court's dismissal of prisoner's ETS claim as "frivolous"); Scott v. District of Columbia, 139 F.3d 940, 944 (D.C. Cir. 1998) (reversing District Court's injunction mandating smoke-free environments for plaintiffs). Both cases are distinguishable from the present one. In Richardson, the prisoner's exposure was at best de minimis and the Court of Appeals for the Fifth Circuit clearly set it apart from cases where prisoners were housed in a severe ETS environment:

> [T]he two Fifth Circuit cases that have recognized a potential ETS-
> based Eighth Amendment claim, the exposure to second-hand
> smoke was substantially more severe and sustained than that
> alleged by Richardson. See Whitley v. Hunt, 158 F.3d 882, 888 (5th
> Cir. 1998) (the prisoner shared living quarters with a smoker);
> Rochon v. City of Angola, 122 F.3d 319, 320 (5th Cir. 1997) (the
> inmate was "required to live and work in 'environments filled with
> tobacco smoke' "). In contrast, Richardson does not share living
> quarters with a smoker, nor does he work in a smoke-filled
> environment. He only alleges that he had to sit near some smokers
> during a bus ride on "several occasions." We do not believe that
> society considers this treatment to "violate[ ] contemporary
> standards of decency."

260 F.3d at 498-99. Unlike Richardson and Scott, the issue in this case does not involve a complete ban on all ETS exposure. Such a ban may be impractical (or impossible) for prison officials to implement. Here, we merely conclude that the District Court correctly determined that the level of ETS to which Atkinson claims he was exposed and his symptoms justify the denial of qualified immunity.

16

> components of tobacco smoke, or who can attribute
> their serious medical conditions to smoke, are entitled
> to appropriate medical treatment, which may include
> removal from places where smoke hovers" . . . . Thus
> we will adhere to the position, adopted by every circuit
> to address the issue, that the Eighth Amendment's
> objective component is violated by forcing a prisoner
> with a serious medical need for a smoke-free

> environment to share his cell with an inmate who
> smokes.

Id., quoting Steading v. Thompson, 941 F.2d 498, 500 (7th
Cir. 1991).

We cannot conclude that appellants are entitled to
qualified immunity. Atkinson has fulfilled Saucier's first
prong for denying qualified immunity by alleging a violation
of a clearly established constitutional right. As both the
Weaver and Alvarado Courts point out the Constitutional
right alleged by Atkinson was established over two decades
ago by the Supreme Court in Estelle. See Alvarado, 267
F.3d at 651; Weaver, 45 F.3d at 1256. Atkinson's amended
complaint alleges that he was exposed, with deliberate
indifference, to constant smoking in his cell for over seven
months and as a result suffered nausea, an inability to eat,
headaches, chest pains, difficulty breathing, numbness in
his limbs, teary eyes, itching, burning skin, dizziness, a
sore throat, coughing and production of sputum. The
dissent describes these symptoms as "causing discomfort
somewhere between that of hay fever and the common cold"
and notes that "millions of people not in prison voluntarily
tolerate similar levels of risk every day from second-hand
smoke and numerous other sources." However, unlike
individuals who voluntarily expose themselves to ETS, a
prisoner cannot simply walk out of his cell whenever he
wishes. When a susceptible prisoner is confined to a cell, a
small and confined space, with a "constant" smoker for an
extended period of time, such symptoms may transform
what would otherwise be a passing annoyance into a
serious ongoing medical need. Additionally, Atkinson has
fulfilled the second prong of Saucier's test by demonstrating
that the constitutional right was clearly established by the
Hunt, Weaver and Estelle Courts on or before his own claim

17

arose in 1998-1999. See Estelle, 429 U.S. at 104 ("We
therefore conclude that deliberate indifference to serious
medical needs of prisoners constitutes the 'unnecessary
and wanton infliction of pain,' . . . proscribed by the Eighth
Amendment."); Weaver, 45 F.3d at 1256 (recognizing that
severe headaches, dizziness, nausea, vomiting, and
breathing difficulties stemming from exposure to ETS
constitutes a serious medical need, which requires removal
of the prisoner from a smoking environment under the
Eighth Amendment); Hunt, 974 F.2d 735-36 (concluding
prisoner could state a present injury claim for ETS
exposure); see also Alvarado, 267 F.3d at 651-52
("[Prisoner]'s complaint stated an Eighth Amendment claim
when he alleged that because of the prison officials'
deliberate indifference, he was being exposed to levels of
ETS which aggravated his chronic asthma, thereby
endangering his existing health, a claim recognized as an
Eighth Amendment violation twenty-five years ago in Estelle
v. Gamble . . . .").9 Moreover, Dr. Rizzo, an examining
physician, has concluded that these symptoms possibly
were precipitated by Atkinson's exposure to ETS. 10 The

9. Although Alvarado postdates the time when Atkinson's cause of action accrued, we cite to that case to demonstrate that, as the Court of Appeals for the Seventh Circuit recognized, the constitutional right which Atkinson asserts was clearly established over twenty-five years ago in Estelle.

10. The dissent contends that Dr. Rizzo's affidavit undermines Atkinson's claim. Aside from the matter that the dissent is weighing the evidence supporting the District Court's determination in contravention of Ziccardi, the dissent misconstrues Dr. Rizzo's statements. Dr. Rizzo noted the following:

> Roger Atkinson is a former cigarette smoker who was diagnosed with childhood asthma and may have symptoms of persistent reactive nasal passages and airways based on his response to exposure to seasonal changes in temperature and air quality. His spirometry is currently normal, but this does not preclude the presence of airway sensitivity.

(A. 127). If anything, this notation supports Atkinson's claim that he is particularly sensitized to air quality and that ETS seriously exacerbates his underlying condition. The dissent also points out that the affidavit of Dr. Keith Ivens weakens Atkinson's claim. This, however, takes this Court into the forbidden territory of evidence weighing.

18

District Court found that deliberate indifference to these alleged symptoms constituted a violation of clearly established law, and we agree. Atkinson alleges that when he tried to seek help at the prison infirmary the treating nurse responded that she was unable to transfer him to a cell with a nonsmoking roommate. Similarly, Atkinson has produced evidence that after telling prison officials about his sensitivity to ETS no change was made in housing conditions. This evidence demonstrates deliberate indifference on the part of prison officials. See Farmer, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . .").

B. The Retaliation Claim

Appellee asserts that appellants harassed him in retaliation for filing his ETS lawsuit. Appellants contend that they are entitled to qualified immunity.11

With respect to this claim, the right implicated under the first prong of the Saucier test for qualified immunity is the First Amendment right of prisoners to petition the court. See Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir.1981). In Milhouse, this Court held that a prisoner alleging that he was subjected to a series of conspiratorially planned disciplinary actions in retaliation for filing a civil rights suit against prison officials stated a cause of action

for infringement of the prisoner's First Amendment right.
Id. Here, appellee's complaint states a similar claim, and

_____

11. The basis for their claim is not clear. In their brief, appellants admit that the law regarding retaliation is clearly established: "It is well-settled law that correctional officials cannot retaliate against inmates due to the inmate's filing of lawsuits with the court." (Appellants' Br. at 22.) Appellants point to evidence and admissions by appellee that contradict his retaliation claims. However, we lack jurisdiction to weigh the evidence because the District Court's determination that the summary judgment record in this case raised a genuine issue of material fact was not a final decision as required by 28 U.S.C. S 1291. See Johnson, 515 U.S. at 313.

therefore meets the first part of the Saucier  test by alleging a violation of a recognized constitutional right.

As to the second part of the Saucier inquiry, the Milhouse Court clearly established a prisoner's right to access the courts so that a reasonable prison official would know that he violates this right if he retaliates against a prisoner for filing a lawsuit. The Milhouse Court stated:"The right of access to the courts must be 'adequate, effective and meaningful,' . . . and must be freely exercisable without hindrance or fear of retaliation." Id. at 374 (internal citation omitted), quoting Bounds v. Smith, 430 U.S. 817, 822 (1977). In Milhouse, the prisoner alleged that prison officials were violating his rights by preventing him from celebrating religious holidays. Id. at 372. Thereafter, prison officials allegedly transferred the prisoner to a less desirable cell house and committed other acts of revenge against him for filing the lawsuit. Id. Although the District Court dismissed the First Amendment retaliation claim, this Court reversed stating: "If [the prisoner] were able to prove an infringement of his first amendment right of access to the courts, he would successfully state a cause of action arising under the constitution." Id. at 374.

Appellee has asserted a claim similar to that in Milhouse, that prison officials took retaliatory actions against him for filing a civil rights lawsuit against them. Appellee claims that he was moved to administrative segregation, humiliated by being forced to disrobe unnecessarily, denied food and access to legal materials and advice, and threatened and subdued by the use of excessive force, all in revenge for filing his ETS claim. Milhouse clearly established that such retaliatory actions, if proven, are not legal. Thus, Saucier's second prong is satisfied and appellants are not entitled to qualified immunity.

C. The Supervisory Appellants

Supervisory appellants Parker, Phelps, Williams, and Taylor contend that appellee failed to present evidence sufficient to demonstrate personal involvement in or actual knowledge by them of the alleged constitutional torts

allegedly committed by appellants Way and Green, and

20

therefore that they are entitled to qualified immunity. See
Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)
("A defendant in a civil rights action must have personal
involvement in the alleged wrongs; liability cannot be
predicated solely on the operation of respondeat superior
. . . . Personal involvement can be shown through
allegations of personal direction or of actual knowledge and
acquiescence . . . ."). In Rode, a civilian employee of the
Pennsylvania State Police joined Governor Thornburgh and
State Attorney General Zimmerman as defendants in a
S 1983 retaliation suit against her superiors. This Court
affirmed the District Court's determination that grievances
filed with state officials' offices were insufficient to prove
actual knowledge and acquiescence by the state officials.
See id. at 1208 ("In a large state employing many
thousands of employees, a contrary holding would subject
the Governor to potential liability in any case in which an
aggrieved employee merely transmitted a complaint to the
Governor's office of administration . . . .").

Appellants suggest that the deposition and interrogatory
answers of a single prisoner are not sufficient to establish
a genuine issue of material fact as to whether the
supervisory appellants had actual knowledge of and
acquiesced in the commission of the alleged constitutional
torts. Although appellants couch this argument as one
relating to qualified immunity, this is the sort of evidence
weighing that we cannot entertain given our limited
jurisdiction on this appeal. See Johnson, 515 U.S. at 313.
In the present case, the District Court concluded that there
is sufficient evidence that appellee either wrote or spoke to
each supervisory defendant regarding both his exposure to
ETS and the retaliatory harassment by appellant Way. We
lack jurisdiction to evaluate the sufficiency of this evidence.
See id.

Alternatively, appellants contend that Rode requires us to
rule as a matter of law that such correspondences or
conversations do not constitute sufficient evidence of actual
knowledge and acquiescence. We, conclude however, that
Rode is factually distinguishable from the present case. The
Governor and the Attorney General in that case were much
farther removed from the state officials committing the

21

alleged constitutional torts than the supervisory appellants
in this case. Here, only Taylor holds a state-wide office.
Moreover, a governor heads the entire executive branch of
a state's government; Taylor is charged with oversight of a
specific state entity responsible for housing prisoners. The
scope of his responsibilities are much more narrow than
that of a governor or state attorney general, and logically
demand more particularized scrutiny of individual

complaints. Similarly, the other supervisory appellants have even narrower responsibilities as links in a chain of command within a single prison. We cannot say as a matter of law that the supervisory appellants did not have actual knowledge when appellee has produced evidence that they did.

IV. CONCLUSION

We express no view as to whether appellee will be able to establish the objective and subjective elements of his ETS claims or prove his other claims.

For the foregoing reasons, we affirm the District Court's denial of appellants' motion for summary judgment with respect to Atkinson's ETS and retaliation and excessive force claims. The appeal of the supervisory appellants is dismissed for lack of jurisdiction.

22

AMBRO, Circuit Judge, Dissenting in Part:

I agree with my colleagues that appellants are not entitled to qualified immunity on Atkinson's retaliation and excessive force claims, and that we lack jurisdiction to decide whether appellants in supervisory positions are entitled to qualified immunity on all claims because they lacked notice of the underlying events. I part on but one issue. The majority holds that prison officials are not entitled to qualified immunity after housing an inmate in a prison where he is exposed to second-hand smoke, causing discomfort somewhere between that of hay fever and the common cold. Further, the majority calls this conclusion "clearly established" federal law, meaning that a reasonable prison official should have known that we would decide the case this way, even though the circuit courts have reached numerous differing results on this issue and there is no controlling precedent. The majority misconstrues the Supreme Court's Eighth Amendment jurisprudence, and, a fortiori, wrongly deems its outcome "clearly established" for purposes of qualified immunity. I respectfully dissent from the reasoning and holding on this issue.

The plaintiff in this case has alleged that his exposure to second-hand cigarette smoke was cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court has recognized that a prisoner may, in the right circumstance, bring such a claim in federal court. The Court also recognized, however, that prison officials are entitled to qualified immunity from suit unless their actions violated a clearly established constitutional right of the plaintiff. Because the record with respect to this issue does not support denying the defendants' motion for qualified immunity, I would reverse the decision of the District Court on Atkinson's Eighth Amendment claim.

Qualified Immunity

The majority states the correct test for qualified immunity from Saucier v. Katz, 533 U.S. 194, 200-01 (2001). We ask first whether the plaintiff alleges facts that state a constitutional violation. If the answer is yes, we ask whether the right claimed is clearly established, meaning

that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. Notwithstanding its accurate statement of this test, the majority misapplies it.

I. Step One: Do the Facts Allege an Eighth Amendment Violation?

A. The Eighth Amendment Standard

The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Thus, for example, a prison in which inmates are recruited to serve as armed guards, four to eleven inmates are crowded into windowless 8È x 10È cells during periods of punitive isolation, those inmates sleep on floor mattresses infested with hepatitis and other infectious diseases, and the inmates receive only 1,000 calories of "grue" to eat each day, violates the Eighth Amendment. Hutto v. Finney, 437 U.S. 678, 682-83 (1978). On the other hand, a prison in which inmates have less living space than experts deem appropriate for their physical and mental health, and the prison houses more inmates than it was designed to hold, does not violate the Eighth Amendment. Rhodes, 452 U.S. at 348-49. As the Supreme Court has said, "the Constitution does not mandate comfortable prisons." Id. at 349.

In deciding whether a particular condition violates the Eighth Amendment, we must not look first to our subjective judgments. See Coker v. Georgia, 433 U.S. 584, 592 (1977) (plurality opinion) ("Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent."). The best indication that a condition is "cruel and unusual" is a consensus among the state legislatures. See Atkins v. Virginia, 122 S.Ct. 2242, 2247 (2002) ("[T]he 'clearest and most reliable objective evidence of contemporary values is

the legislation enacted by the country's legislatures.' ") (citation omitted). Only where there is a consensus may we consider whether our own judgment tips the balance

towards finding a constitutional violation. Id.  ("Thus, in cases involving a consensus, our own judgment is 'brought to bear.' ") (citation omitted).

Subpar medical care does not automatically violate the Eighth Amendment. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. To be "cruel and unusual," medical care, like other prison conditions, must contravene "evolving standards of decency." Id. Thus, only "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" can violate the Eighth Amendment. Id. This test contains objective and subjective components.

Objectively, the prisoner must present "serious medical needs." A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citation omitted). A medical need is also serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," Estelle, 429 U.S. at 103, or a "life-long handicap or permanent loss," Lanzaro, 834 F.2d at 347.

Subjectively, prison officials must exhibit "deliberate indifference" to those needs. Under that standard,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).

B. Environmental Tobacco Smoke ("ETS") Claims

Occasionally prisoners bring Eighth Amendment suits alleging that their exposure in prison to second-hand

smoke, known as environmental tobacco smoke ("ETS"), constitutes "cruel and unusual punishment." These ETS claims, as they are called, come in two varieties-- present injury claims and future injury claims -- and are measured by different standards. Atkinson's suit involves both.

    1. Requirements for Present Injury Claims

A present injury claim alleges that exposure to ETS poses a risk to a prisoner's existing medical needs. It is a standard condition-of-confinement claim governed by the

principles the Supreme Court established in Estelle and Farmer. Thus, a prisoner must allege a sufficiently serious medical need (the objective component) and deliberate indifference by prison officials in response (the subjective component).

### 2. Requirements for Future Injury Claims

A future injury claim alleges that an inmate's ETS exposure is creating a risk of future medical harm so grave that society will not condone its prisoners (or anyone else) being exposed to it. Helling v. McKinney, 509 U.S. 25, 36 (1994). Helling analyzed only future injury ETS claims.1 An inmate whose cellmate smoked five packs of cigarettes a day sued under the Eighth Amendment for injunctive relief and compensatory damages, alleging that his constant exposure to ETS damaged his health. Id. at 28. The Magistrate entered a directed verdict for the prison officials. He reasoned that although the plaintiff could hypothetically prevail on his claims by showing serious medical needs and deliberate indifference to those needs, he could not support either prong with sufficient evidence. The Court of Appeals reversed in part, finding that the Magistrate properly rejected the present injury claim but should have allowed

_____

1. The complaint in Helling alleged present and future injuries, but the Supreme Court focused on the future injury claim. See 509 U.S. at 31 (stating "the primary question on which certiorari was granted" to be "whether the court below erred in holding that McKinney had stated an Eighth Amendment claim on which relief could be granted by alleging that his compelled exposure to ETS poses an unreasonable risk to his health.") (emphasis added).

26

the plaintiff 's suit to proceed on the theory that the level of ETS to which he was exposed posed an intolerable risk to his future health, i.e. a future injury claim. Id. at 28-29.

The Supreme Court affirmed. It held that, in theory, a prisoner forced to inhale five packs a day of second-hand smoke conceivably might face future health risks sufficiently serious to violate the Eighth Amendment. It observed, for example, that in Hutto v. Finney , 437 U.S. at 682, the high risk that prisoners would eventually contract hepatitis and venereal disease from their communal floor mats helped to support a finding of an Eighth Amendment violation. Helling, 509 U.S. at 33. Similarly, unreasonably high ETS levels could create a condition of confinement that "is sure or very likely to cause serious illness and needless suffering the next week or month or year." Id. In light of this possibility, the Court remanded for the District Court to evaluate the plaintiff 's future injury claim on the merits. Id. at 35 ("We cannot rule at this juncture that it will be impossible for McKinney, on remand, to prove an Eighth Amendment violation based on exposure to ETS.").

Helling established a strict test for Eighth Amendment

ETS claims. The Court stated that on remand the plaintiff was required to "prove both the subjective and objective elements necessary to prove an Eighth Amendment violation." Id. at 35. As the Court's opinion reveals, a prisoner bears significant burdens in establishing a viable claim, and a district court must undertake a number of inquiries to determine whether a plaintiff has produced sufficient evidence to support a future injury claim.

As to the first -- the objective factor -- a plaintiff "must show that he himself is being exposed to unreasonably high levels of ETS." Id. For example, in the circumstances of the case before the Helling Court, "[p]lainly relevant to this determination is the fact that [the prisoner] has been moved [from one prison to another] and is no longer the cellmate of a five-pack-a-day smoker." Id. Also, the fact that the director of the Nevada state prison system subsequently had adopted a formal smoking policy meant that

> [i]t is possible that the new policy will be administered in a way that will minimize the risk to [the prisoner]

27

> and make it impossible for him to prove that he will be exposed to unreasonable risk with respect to his future health or that he is now entitled to an injunction.

Id. at 36. In addition, "determining whether [the prisoner's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS." Id. Courts must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. Stated another way, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id.

As to the second factor -- the subjective factor known as deliberate indifference -- the district court should make its conclusions "in light of the prison authorities' current attitudes and conduct, which may have changed considerably since the judgment of the Court of Appeals." Id. In Helling, the Supreme Court noted that because Nevada had adopted a smoking policy for its prisons, this "will bear heavily on the inquiry into deliberate indifference," possibly making it more difficult to show that prison officials are not responding to the dangers of ETS, and reducing inmates' exposure as a result. Finally,"[t]he inquiry into this factor also would be an appropriate vehicle to consider arguments regarding the realities of prison administration." Id.

C. Application of the Law to Atkinson's Case

This case in my view is underwhelming with regard to

either the present or future injury claims.[2] Atkinson's

_____

2. The majority repeatedly scolds my dissent for entering the "forbidden territory" of evidence-weighing. This assertion is contradicted by the very language the majority cites for support. In Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d Cir. 2002), we stated that

> we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the

28

allegations of "constant" exposure to ETS for approximately seven months theoretically may present a viable claim, but the evidence identified by the District Court is insufficient to establish an Eighth Amendment violation. Atkinson cannot show that his current condition creates a "serious medical need," or that, following a scientific and statistical inquiry, his risk of future harm is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. at 34, 36.

The majority decides what conditions society will not tolerate in its prisons without considering what society itself -- primarily through the decisions of its local legislators and politicians -- has said on the topic. The majority's attempt to assemble a societal consensus consists of its citing an executive order by the then-Governor of Delaware restricting smoking in some state buildings, but exempting prisons. Del. Exec. Order 71, at P 6 (Apr. 4, 1989). Even without the prison exemption, a single executive order from one state is obviously inadequate evidence of a national consensus.[3] Moreover, in

_____

> set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right.

In other words, Ziccardi instructs that in cases where the district court denied summary judgment by finding genuine issues of material fact, the appeals court does not have jurisdiction to review questions of fact (e.g., did the plaintiff request, and the defendant refuse, a transfer to a nonsmoking cell), but it does have jurisdiction to review questions of law (e.g., on the basis of the facts identified by the district court, did the plaintiff adequately allege the violation of a clearly established constitutional right).

Here, the District Court concluded that "genuine issues of material fact exist as to: (1) whether Plaintiff was exposed to unreasonably high levels of ETS; and (2) whether it is contrary to current standards of decency for anyone to be exposed to sufficient environmental tobacco smoke to cause the symptoms Plaintiff suffered." The District Court's findings that the levels of ETS to which Atkinson was exposed may have been both unreasonable and contrary to current standards of decency thus fall within our appellate jurisdiction "to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right."

3. In May 2002 the Delaware General Assembly passed significantly tightened restrictions on smoking in public spaces. 16 Del. C. S 2903,

light of the prison exemption, the majority's extrapolation of any (let alone a national) consensus is a generous view of Delaware's status as a bellwether of public opinion. 4

### 1. Present Injury Claim

Atkinson has failed to present evidence from which a jury reasonably could find a serious medical need. His physical condition belies any harm. For example, Atkinson does not suffer asthma attacks in response to ETS.5  He does not seem to require medical treatment. Indeed, no doctor has ordered that Atkinson be placed in a non-smoking area.

Further undermining Atkinson's present injury claim is the dearth of medical evidence in his favor. The report from Atkinson's doctor, Dr. Rizzo, is so lacking that it might as well have been written for the defendants. It says that Atkinson's 1995 pituitary surgery, not second-hand smoke,

---

amended by 2002 Delaware Laws Ch. 275 (S.B. 99) (effective late November 2002). It is certainly possible that other states will do the same. According to the Centers for Disease Control, however, as of October 16, 2002, only California has eliminated smoking from virtually all its public places, including bars and restaurants. See Exposure to Environmental Tobacco Smoke and Cotinine Levels--Fact Sheet, http://www.cdc.gov/tobacco/research_data/environmental/factsheet_ets.htm (last visited January 2, 2003). Nevertheless, Delaware's statute covers only "any indoor enclosed area to which the general public is invited or in which the general public is permitted," and therefore clearly not prisons. Moreover, the public smoking laws of a few states do not amount to a national consensus. With regard to the second prong of the Saucier test, even if these laws did represent a new national consensus, they do nothing to make that consensus "clearly established" in 1998 and 1999 when the events in this case took place.

4. The majority's statement in footnote 7 that"[p]roof of a national consensus might include, inter alia, the federal regulation which protects the public and federal employees from ETS in all federal workplaces" lays out just how speculative the majority's rationale is. That the District Court might have found evidence of a societal consensus on ETS within the Code of Federal Regulations is not to say that it did.

5. Atkinson does hint that he is asthmatic or that he had "childhood asthma," but neither he nor his doctors contend that the evidence could support a claim that he suffers from asthma now.

causes his chronic headaches. It also observes that Atkinson smoked for twenty-seven years, and that his symptoms did not change during the year he was isolated

from second-hand smoke in prison. It concludes that Atkinson has "symptoms of persistent reactive nasal passages and airways based on his response to exposure to seasonal changes in temperature and air quality" and that Atkinson's "spirometry [lung function] is currently normal." (Emphasis added.)

The only statement in the report conceivably supporting Atkinson's claim is Dr. Rizzo's ambivalent "impression" that "it is within reasonable medical probability that symptoms of itchy and burning eyes, chest pains, sore throat, persistent cough with sputum production, paroxysms of coughing and resultant headaches would all [be] precipitated by exposure to second-hand smoke." An impression is not a diagnosis. Even if it were, it is unavailing for Atkinson. Not only does the report not suggest that Atkinson's symptoms constitute "serious medical needs," it does not even say that ETS caused them, only that it is "within reasonable medical probability" that these symptoms would be caused by exposure to ETS. Instead of "it is reasonably medically certain" -- or even "it is reasonably medically probable," Dr. Rizzo writes as if it is possible that Atkinson's symptoms fall within the larger set of medical probability.

The affidavit from the prison medical director, Dr. Keith Ivens, weakens Atkinson's claim even further. Dr. Ivens writes that Atkinson never complained to him of second-hand smoke during several examinations, that Atkinson's symptoms are consistent with "seasonal allergies," and that they are, in fact, likely caused by allergies because the unit where he "has resided for more than the past year (1-F) is a smoke-free environment." Dr. Ivens concludes:"I can see no medical evidence that second-hand smoke is adversely affecting the health of Roger Atkinson."

Fully accepting the District Court's findings, Atkinson's symptoms cannot be the predicate for a present injury Eighth Amendment violation. They are not severe enough to constitute a serious medical need. Every prisoner faces discomforts in prison that he would rather avoid, but that

31

nonetheless do not violate the Constitution. See Rhodes, 452 U.S. at 349.

2. Future Injury Claim

Atkinson's future injury claim fares no better. As already mentioned, Helling held that a successful ETS claim under the Eighth Amendment must meet two objective criteria. It requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS." 509 U.S. at 36. "[I]t also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone

unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Id.

The District Court's "scientific and statistical inquiry" is a generic letter from A. Judson Wells, Ph.D., about the dangers of ETS. That letter summarizes several recent studies demonstrating a link between second-hand smoke and increased risk of heart disease and lung cancer. Those studies have nothing to do with prison settings or with Atkinson's particular case. The letter concludes:"Overall, I would say that for Mr. Atkinson to continue in a smoke filled cell would increase his risk of death, or non-fatal heart attack or stroke. Lung cancer risk develops more slowly."

This letter does not satisfy Helling. Dr. Wells did not study Atkinson himself to determine his particular increased risk of future disease; he merely generalized based on a selected set of studies from medical journals. The Seventh Circuit has specifically rejected the substitution of generalized medical knowledge for a specific medical examination. See Henderson v. Sheahan , 196 F.3d 839, 852 (7th Cir. 1999) ("To avoid having damages awarded on the basis of mere speculation or conjecture, it only makes sense that the medical expert should be able to testify to a reasonable degree of medical certainty that the particular plaintiff himself faces the increased risk of harm

32

whatever that level of risk."). Here, when Dr. Wells attempted to extrapolate the results of outside studies to Atkinson, he did not even venture to suggest a level of increased risk for heart disease or stroke. And his prediction for lung cancer risk is even more ambiguous. That risk, he says cryptically, "develops more slowly."

Moreover, Helling requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS." 509 U.S. at 36 (emphasis added). The risk must "be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. Here, we do not know the risk, but even the studies Dr. Wells cites make it obvious that Atkinson is by no means likely to develop heart disease or lung cancer because he lived with a smoking cellmate (or cellmates) for several months. It thus appears a leap of logic to conclude that society finds this risk to exceed "contemporary standards of decency." After all, millions of people not in prison voluntarily tolerate similar levels of risk every day from second-hand smoke and numerous other sources. (Indeed, millions more smoke themselves.) In this context, Atkinson cannot state an Eighth Amendment claim based on his risk of future injury caused by ETS.6

As with the present injury claim, the majority's analysis on this issue is unconvincing. The majority says nary a

word about Atkinson's failure to provide scientific or statistical evidence in support of his claim, as Helling expressly requires. And it offers no reason to believe that the risks to which Atkinson alleges he was exposed are so grave that it violates contemporary standards of decency to expose anyone to them unwillingly.

II. Step Two: Is the Right Clearly Established?

Because Atkinson does not state an Eighth Amendment violation on either his present injury or future injury

─────────────────────────────────────────────

6. Because Atkinson cannot satisfy the objective requirements of showing a serious medical need or an unreasonably grave risk of injury on either his present injury or future injury claims, we do not need to consider whether prison officials demonstrated deliberate indifference.

33

claims, we do not have to consider whether his rights under the Eighth Amendment were clearly established. See Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). Nonetheless, the majority's analysis on this point merits a response.

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. Qualified immunity "operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.' " Hope v. Pelzer, 122 S.Ct. 2508, 2515 (2002) (citation omitted). Accordingly, if our Court has not decided a particular question (which is the case here) and several other courts have reached inconsistent outcomes on relatively similar facts (which is also the case here7), the right at issue cannot be clearly established. See Donovan v. City of Milwaukee, 17 F.3d 944, 953 (7th Cir. 1994) ("Because only two circuits had considered cases on point, reaching opposite results, we conclude that 'the relevant case law was still developing [and] the key issue in this case had not been clearly settled.' ") (citation omitted); see also Wilson v.

─────────────────────────────────────────────

7. The majority cites a number of opinions in support of its assertion that prisoners have a clearly established right to be free from unreasonable levels of ETS. In most of these decisions the court made little effort to determine whether the circumstances represented an unacceptable risk to prisoners' health, presumably because most of the cases involved appeals from rulings on motions to dismiss, a much easier stage to survive than summary judgment because, unlike summary judgment, motions to dismiss require no evidentiary support for the plaintiffs' claims. Ultimately, ETS claims for either present or future injuries rarely succeed unless the exposure is obviously intolerable. See, e.g., Richardson v. Spurlock , 260 F.3d 495 (5th Cir. 2001); Henderson v. Sheahan, 196 F.3d 839 (7th Cir. 1999); Scott v. District of Columbia, 139 F.3d 940 (D.C. Cir. 1998); Oliver v. Deen, 77

F.3d 156 (7th Cir. 1996); Mills v. Clark, 229 F.3d 1143, 2000 WL 1250781 (4th Cir. Sept. 5, 2000) (unpublished). Granted, some of these decisions were appeals from decisions on the merits, not interlocutory appeals of qualified immunity determinations. Nevertheless, they demonstrate that many courts have rejected prisoner ETS claims and that plainly the circuits differ in their amenability to these suits.

Layne, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."); Rogers v. Pendleton, 249 F.3d 279, 288 (4th Cir. 2001) ("[I]f there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes.").

To demonstrate that Atkinson's right to be shielded from ETS was clearly established, the majority merely invokes Helling -- without any accompanying analysis-- and cites a number of other cases that do the same.8  Saucier mandates that the inquiry into whether a right was clearly established for the purposes of granting qualified immunity "must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." 533 U.S. at 201. The majority simply passes on the mandatory examination into whether this plaintiff under the circumstances of this case had a clearly established Eighth Amendment right to not be exposed to this level of ETS. See Mills, 229 F.3d at 1143, 2000 WL 1250781, at *5 ("Helling does not guarantee plaintiff a smoke free environment.").

---

8. For example, the majority relies primarily on Warren v. Keane, 196 F.3d 330 (2d Cir. 1999), in which the Second Circuit found that inmates could survive summary judgment on their future injury ETS claim by alleging that their confinement "creates serious long-term health risks." Id. at 332. The cursory, four-page Warren  opinion did not consider whether the facts plaintiffs alleged stated an Eighth Amendment violation, did not mention the level of smoke exposure or why that level might be unreasonably high under Helling, and referenced neither the required "scientific and statistical inquiry" nor any support for the proposition that society would find the ETS levels in that case -- whatever they might have been -- intolerable for its prisoners.

Contrary to the majority's assertion, I do not fail to recognize that Warren is factually and procedurally analogous. Warren lacks persuasive value not because it is distinguishable, but rather because it fails to perform the analysis mandated by a prisoner ETS claim.

* * * * *

On the present injury claim, considering the lack of medical evidence in Atkinson's favor, no reasonable prison official could have predicted that Atkinson's relatively minor symptoms (which appear to have been caused by seasonal allergies) would support an Eighth Amendment suit. The majority cites no case to the contrary, and certainly not the "consensus of cases," Rogers, 249 F.3d at 287-88, needed to overcome qualified immunity.

On the future injury claim, neither the Supreme Court nor any other court has stated that a particular level of ETS violates the Eighth Amendment. Helling did not conclude that the level of ETS exposure in that case -- five packs a day in a two-person cell -- was cruel and unusual; the Supreme Court remanded for the trial court to make this determination following a fact-intensive inquiry. Our jurisdiction is limited to reviewing whether the set of facts identified by the District Court is sufficient to establish a violation of a clearly established constitutional violation. The facts identified by the District Court's analysis in this case do not.

For these reasons, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

36