288 F.3d 57
 * Joseph ZICCARDI, Esq., as Administrator of the Estate of James Smith,
v.
CITY OF PHILADELPHIA; Roger Morfitt; Joseph DiFrancesca, Joseph DiFrancesca and Roger Morfitt, Appellants.
* (Amended—See Court's Order dated 3/14/02)
 No. 01-1895.
 United States Court of Appeals, Third Circuit.
 Argued January 15, 2002.
 Opinion Filed April 30, 2002.
 
 Richard G. Feder (Argued), Chief Deputy City Solicitor (Appeals), Sara E. Ricks, Philadelphia, PA, for Appellants.
 Edward T. Lawlor, Jr. (Argued), Newtown Square, PA, Leonard A. Cohen, Philadelphia, PA, for Appellee.
 Before ALITO and ROTH, Circuit Judges, and SCHWARZER,* Senior District Judge.
 OPINION OF THE COURT
 ALITO, Circuit Judge.
 
 
 1
 This is an appeal from a district court order denying a motion for summary judgment based on qualified immunity in an action under 42 U.S.C. § 1983. The action was filed by James Smith, now deceased, against two Philadelphia Fire Department paramedics and the city. Smith alleged that the paramedics rendered him a quadriplegic by lifting him after he had fallen from a wall and sustained spinal injury. He claimed that the actions of the paramedics violated his rights under the Due Process Clause of the Fourteenth Amendment. The district court held that the summary judgment record was sufficient to show that the paramedics acted with subjective deliberate indifference and therefore denied their summary judgment motion. To the extent that this appeal raises issues of law, we affirm the decision of the district court. To the extent that the appeal disputes the district court's identification of the facts that are subject to genuine dispute, we dismiss the appeal for lack of appellate jurisdiction.
 
 I.
 
 2
 In the early morning hours of May 16, 1998, after a night of drinking, James Smith, then 24 years old, went to his aunt's residence in Philadelphia, where he often stayed. App. at 5a. He was not able to enter the house because he did not have a key and no one responded to his knocks on the door. Id. He therefore sat down on the wall in front of the house and eventually fell asleep. Id. He apparently fell from the wall and dropped about eight feet to the sidewalk below. Id. After Smith fell, several neighbors heard him groaning and yelling, but by all accounts he was moving his legs and arms. Id.
 
 
 3
 Joseph DiFrancesca and Roger Morfitt ("the appellants"), Philadelphia Fire Department paramedics, responded to a 911 call placed by a neighbor. According to Maceo Gatewood, a neighbor, the following then occurred. When the paramedics approached Smith, they asked him what his name was and what was wrong. Supp. App. at 5b. He said: "I'm hurt. I hurt my head." Id. Smith repeated several times that he had hurt his neck.[2] App. at 144a-45a. One of the paramedics said: "[G]et up. Are you drunk?" and "[G]et up or we're going to call the police." Id. at 182a-83a. Smith responded, "I can't get up." Id. at 183a. After nudging Smith a few times and again asking him to get up, the paramedics each grabbed one of Smith's arms and "snatched him up and threw each arm over their shoulders and dr[agged] him to the ... stretcher," which they had removed from the ambulance and placed in the street. Id. at 183a-84a. Gatewood said that the paramedics "snatched up" Smith "pretty hard" and that after they did so his head jerked back. Id. at 185a. In Gatewood's words, Smith "sort of got real limp after that, like everything started hanging on him," and he did not move his arms or legs thereafter. Id.
 
 
 4
 Another neighbor, Roberta Brown, gave the following account. She said that when the paramedics arrived at the scene, she told them that Smith was called "Man," and they said: "[G]et up, Man. Get up before we call the police. You're only drunk, get up." App. at 186a. Smith responded: "I'm hurt." Id. at 187a. The paramedics then each took one of his arms and "yanked him up." Id. In Brown's words, Smith then "started hollering, `Miss Burt, Miss Burt, tell them to put me down. I can't move.' And they yanked him up and his head went back." Id. at 186a 87a. The paramedics then got the stretcher; one lifted his feet and the other lifted the upper part of his body, and they put him on the stretcher and took him away. Id. at 187a.
 
 
 5
 Smith recounted what happened as follows. When the paramedics arrived, he was on his stomach, and they told him to get up. App. at 83a-84a. He replied: "I can't get up." Id. at 85a. They then said: "Get up before we call the cops on you." Id. Smith responded: "I can't move. I can't get up." Id. at 86a. The paramedics then rolled him on his back, each paramedic grabbed an arm, and they "pulled" or "yanked" him up. Id. As they pulled him up, his neck "snapped back." Id. at 87a. In Smith's words, "it was like somebody hit a light switch and [he] just went completely numb" below the neck. Id. at 87a-88a. The paramedics then laid him down, got the stretcher, put him on the stretcher, and transported him to a hospital. Id. at 88a-89a.
 
 
 6
 When Smith reached the hospital, the doctors recognized the seriousness of his condition and stabilized his neck by putting him in a hard collar and placing him on a board. App. at 208a. He was diagnosed with permanent quadriplegia. Id. at 7a. A physician who treated Smith at the hospital stated:
 
 
 7
 It is a medical certainty that [the paramedics] should have immobilized his cervical spine prior to moving him. To have, instead, lifted him by his arms and then by his shoulders and legs is unconscionable. It is my opinion within a reasonable degree of medical certainty, that Mr. Smith's quadriplegia is directly attributable to the actions of the paramedics.
 
 
 8
 Id. at 213a.
 
 
 9
 Dr. Stephan Lynn, an expert in emergency medical services, reviewed the records and opined that the paramedics "demonstrated incredible and shockingly deliberate indifference to Mr. James Smith and to his needs as an injured person seeking ambulance assistance." App. at 225a.
 
 
 10
 In October 1999, Smith filed a complaint in the Court of Common Pleas of Philadelphia County, asserting due process claims against the two paramedics and the city. The complaint alleged that the paramedics' actions in lifting him improperly had deprived him of his liberty interest in bodily integrity. The complaint also alleged that the paramedics' conduct was in accordance with an established city custom of treatment toward intoxicated individuals and that the paramedics' conduct resulted from the city's failure to provide proper training despite prior instances of mistreatment.
 
 
 11
 The defendants removed the case to the United States District Court for the Eastern District of Pennsylvania and, after discovery, moved for summary judgment. The individual defendants asserted the defense of qualified immunity, but the district court refused to grant summary judgment on that ground. The court held that "a reasonable jury could find that the defendant paramedics acted with deliberate indifference and in a manner that shocks the conscience in injuring the plaintiff." Dist. Ct. Op. at 2. The district court also concluded that "clearly established law at the time of the incident provided sufficient guidance to the defendants about the unconstitutionality of their conduct." Id. In addition, the court denied the city's request for summary judgment because that request was based solely on the contention that no underlying due process violation could be established. Id. The individual defendants then took this appeal.[3]
 
 II.
 
 12
 On appeal, the appellants first contend that the district court applied the wrong legal standard in denying their summary judgment motion. They argue that, "[a]t an absolute minimum," the plaintiff was required to show that they had "actual knowledge" that he had suffered a serious spinal injury and that they nevertheless moved him "with actual deliberate indifference to his safety." Appellants' Br. at 10. The appellants also contend that even proof of "actual deliberate indifference" may not suffice and that, under our decision in Miller v. City of Philadelphia, 174 F.3d 368 (3d Cir.1999), "a state of mind that approaches `an intent to harm' plaintiff is required to prove a constitutional violation in the instant context." Id. at 13.
 
 
 13
 The appellants maintain that we have jurisdiction to consider both of their arguments under the collateral order doctrine first recognized in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), but they read the relevant precedents too broadly. In Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable `final decision'" under the collateral order doctrine. Id. at 530, 105 S.Ct. 2806 (emphasis added). In Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), the Court made it clear that the collateral order doctrine does not permit an appeal from an order denying a motion for summary judgment if the issue raised is "whether or not the evidence in the pretrial record [is] sufficient to show a genuine issue of fact for trial." Id. at 307, 115 S.Ct. 2151.
 
 
 14
 Johnson involved an action under 42 U.S.C. § 1983 against five police officers for use of excessive force in effecting an arrest. Id. Three of the officers moved for summary judgment, arguing that there was insufficient evidence in the summary judgment record to permit a reasonable finder of fact to find that they were present when the plaintiff was beaten. Id. The district court denied this motion, concluding that there was enough evidence to defeat summary judgment. Id. at 308, 115 S.Ct. 2151. The officers appealed and invoked the collateral order doctrine, but the Supreme Court unanimously held that appellate jurisdiction was lacking. Id. The Court held that Mitchell does not authorize an appeal from an order denying summary judgment if the order, "though entered in a `qualified immunity' case, determines only a question of `evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." Id. at 313, 115 S.Ct. 2151. As we understand Johnson, if a defendant in a constitutional tort case moves for summary judgment based on qualified immunity and the district court denies the motion, we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right.[4] See Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 208 (3d Cir.2001).
 
 
 15
 The appellants urge us to read Johnson to apply only to evidentiary questions regarding conduct as opposed to intent. Relying chiefly on Jeffers v. Gomez, 267 F.3d 895, 907-10 (9th Cir.2001), they argue that Johnson permits us to entertain a collateral order appeal that challenges a district court's decision denying summary judgment on the ground that there is a genuine issue of fact as to whether the defendant acted with the intent required by the particular constitutional claim asserted. We cannot agree. In our view, Johnson clearly applies to factual disputes about intent, as well as conduct.
 
 
 16
 First, we see nothing in the Johnson Court's reasoning that supports a distinction between issues of conduct and issues of intent. Referring to the requirement of the collateral order doctrine that an appeal must present an issue completely separate from the merits of the case, Johnson observed that "[w]here ... a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial, it will often prove difficult to find any such `separate' question — one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits." Johnson, 515 U.S. at 314, 115 S.Ct. 2151. This reasoning applies equally to questions regarding proof of conduct and proof of intent. The latter are no more separable from the merits of the case than the former.
 
 
 17
 The Johnson Court also noted that "the existence, or nonexistence, of a triable issue of fact [] is the kind of issue that trial judges, not appellate judges, confront almost daily," and the Court added that "[i]nstitutionally speaking, appellate judges enjoy no comparative expertise in such matters." Id. at 316, 115 S.Ct. 2151. Again, this reasoning applies equally to questions regarding conduct and intent.
 
 
 18
 Finally, Johnson reasoned that "the close connection between [the kind of issue raised in the case before it] and the factual matter that will likely surface at trial means that the appellate court, in the many instances in which it upholds a district court's decision denying summary judgment, may well be faced with approximately the same factual issue again, after trial, with just enough change brought about by the trial testimony to require it, once again, to canvass the record." Id. at 316-17. This, the Court observed, would result in an "unwise use of appellate courts' time." Id. at 317, 115 S.Ct. 2151. These observations, too, seem equally applicable to issues of conduct and intent. Thus, the reasoning of Johnson lends no support to the appellants' proffered distinction between conduct and intent.
 
 
 19
 Second, at least one passage in Johnson refers directly to questions of intent and suggests that the Court specifically contemplated that its decision would not allow interlocutory appeals regarding the sufficiency of the evidence of intent. The Court wrote:
 
 
 20
 [Q]uestions about whether or not a record demonstrates a `genuine' issue of fact for trial, if appealable, can consume inordinate amounts of appellate time. Many constitutional tort cases, unlike the simple `we didn't do it' case before us, involve factual controversies about, for example, intent-controversies that, before trial, may seem nebulous. To resolve these controversies — to determine whether there is or is not a triable issue of fact about such a matter — may require reading a vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials.
 
 
 21
 Id. at 316, 115 S.Ct. 2151 (emphasis added). We thus reject the appellants' reading of Johnson.
 
 III.
 
 22
 With this understanding of the scope of our appellate jurisdiction in mind, we address the specific arguments raised by the appellants. As noted, the appellants' first argument is that, at an absolute minimum, the plaintiff is required to show that they acted with subjective deliberate indifference and that the district court did not apply this standard. This is a question of law, and it is therefore properly before us, but we reject the argument on the merits for the simple reason that the district court did apply the subjective indifference standard. The district court wrote:
 
 
 23
 Most courts have held that the deliberate indifference standard requires a showing of "subjective deliberate indifference".... A subjective standard would require that the defendants actually knew of Smith's injuries. The record reveals sufficient facts from which a reasonable jury could find that the defendants inferred that Smith was seriously injured.
 
 
 24
 Dist. Ct. Op. at 18-19. After recounting some of what the neighbors had said, the court concluded:
 
 
 25
 Whether DiFrancesca and Morfitt actually did draw the inference that Smith was seriously injured from these facts is an issue for a jury to decide. The Court finds that a reasonable fact-finder would be able to find that the paramedics had actual knowledge of the fact that Smith was seriously injured.
 
 
 26
 Id. at 20. The appellants' argument that the district court did not apply the "subjective deliberate indifference" test is thus entirely without merit.
 
 
 27
 The real thrust of the appellants' argument appears to be that the summary judgment record is insufficient to prove that they acted with subjective deliberate indifference. Since the district court held to the contrary, they reason that the court must not in fact have applied the right legal standard. The appellants state that, while the district court's opinion contains language "purporting to apply ... the ... subjective test of actual knowledge, the district court in reality applied a reasonable-person objective, negligence-like standard." Appellants' Br. at 10. The appellants' argument is an attempt to circumvent Johnson by disguising what is in truth an evidentiary argument as a legal argument. The disguise is transparent, and we dismiss the appellants' appeal to the extent that it presses this evidentiary issue.
 
 IV.
 A.
 
 28
 The appellants' remaining argument is that even "subjective deliberate indifference" is not enough. In the district court, the appellants argued that the plaintiff was required to prove that they acted with an actual intent to harm him. See Dist. Ct. Op. at 9. The appellants' briefs on appeal did not advance this argument, and at oral argument, however, counsel for the appellants specifically stated, in response to a question, that he was not arguing that an actual intent to harm is needed. Instead, the appellants have fallen back on the position that something more than subjective deliberate indifference but less than actual intent to harm is required. Relying on a phrase in Miller, they contend that the requisite intent is "gross negligence or arbitrariness that indeed `shocks the conscience.'" Miller, 174 F.3d at 375-76. The question whether something more than subjective deliberate indifference must be shown in this case is a legal question that we may entertain in this appeal.
 
 B.
 
 29
 The intent needed to support a substantive due process claim is a question that has long troubled our court. See, e.g., Davidson v. O'Lone, 752 F.2d 817 (3d Cir. 1984) (en banc), aff'd, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); Fagan v. City of Vineland, 22 F.3d 1283 (3d Cir. 1994) (en banc); Nicini v. Morra, 212 F.3d 798 (3d Cir.2000) (en banc). The Supreme Court most recently discussed this issue in County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), a police chase case. After noting that "`[t]he touchstone of due process is protection of the individual against arbitrary action of government,'" id. at 845, 118 S.Ct. 1708 (quoting Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)), the Court added that "the cognizable level of executive abuse of power" is "that which shocks the conscience." Id. at 846, 118 S.Ct. 1708. The Court stated that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849, 118 S.Ct. 1708. The Court acknowledged that it had held that "deliberate indifference," as opposed to an intent to harm, was sufficient in one context, medical treatment of pretrial detainees. Id. at 849-50. In that situation, the Court observed, deliberation about the proper course of conduct "is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." Id. at 851, 118 S.Ct. 1708. The Court contrasted "the custodial prison situation" with a police chase. Id. at 853, 118 S.Ct. 1708. The Court stressed that a police officer, in deciding whether to begin or break off a chase, does not have time to deliberate and must balance the risks of a chase against the risks of permitting the suspect to escape. Id. The Court therefore held that in a police chase case an actual intent to harm must be shown. Id. at 854, 118 S.Ct. 1708.
 
 
 30
 We have applied Lewis in several subsequent cases. In Miller, on which the appellants rely, a mother and her children claimed that a social worker violated their substantive due process rights by taking actions that led to an emergency ex parte order removing the children from the mother's custody due to suspected child abuse. Miller, 174 F.3d at 370-71. Noting that "a social worker acting to separate parent and child ... rarely will have the luxury of proceeding in a deliberate fashion," we held that "the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed `shocks the conscience.'" Id. at 375-76.
 
 
 31
 In Nicini v. Morra, 212 F.3d 798 (3d Cir.2000), we considered a substantive due process claim asserted by a minor against a caseworker from the New Jersey Division of Youth and Family Services based on the minor's abuse in what we viewed as tantamount to a foster home. Id. at 800. We analogized the situation of a minor placed in a foster home with that of an institutionalized person and noted that the caseworker had time to make unhurried judgments in deciding whether to permit the minor to remain in the home. Id. at 807. We thus distinguished Miller and held that a standard of deliberate indifference was appropriate. Id. at 810-11.
 
 C.
 
 32
 The appellants' current argument — that Smith is required to prove something more than subjective deliberate indifference but less than an intent to harm — was never raised in the district court. Instead, the appellants argued in the district court that an intent to harm is needed. They maintained that the intent-to-harm standard adopted in Lewis should apply and stated: "Paramedics are similarly situated to pursuing police officers and their actions should be held to the same consci[ence] shocking standard. They make decisions in haste, under pressure, and without the luxury of a second chance." App. at 262a. Although the appellants cited and briefly discussed Miller in their papers, they never mentioned that the standard applied in Miller required less than an intent to injure, and they never argued — even as a back-up argument — that this lesser standard should be applied. See App. at 263a.
 
 
 33
 We generally do not address arguments that were not made in the district court and we therefore decline to consider the appellants' current argument as a ground for reversing the decision of the district court. See Bailey v. United Airlines, 279 F.3d 194, 202 (3d Cir.2002); Brown v. Philip Morris, Inc., 250 F.3d 789, 799 (3d Cir.2001). However, because it would be inefficient for us to remand this case to the district court without clarifying whether Miller requires proof of more than subjective deliberate indifference, we will address that question.
 
 
 34
 We agree with the appellants that Miller, which is of course binding on us, mandates at least something more than subjective deliberate indifference as that term is defined in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).[5] Miller is important here for at least two reasons. First, the lead plaintiff in Miller (the mother) — like Smith in this case and unlike the plaintiff in Nicini— was not in a situation analogous to institutionalization, but the court nevertheless held that an actual intent to harm was not needed to support the due process claim. Miller, 174 F.3d at 375-76. Second, Miller's reason for holding that more than deliberate indifference had to be shown — the social worker's need to act without "the luxury of proceeding in a deliberate fashion," id. at 375 — seems equally applicable here. While the record in the present case does not suggest that the appellants had any particular need to move Smith quickly — for example, he was not in a dangerous location and did not appear to have any other medical problems requiring prompt movement — the social worker in Miller similarly does not appear to have had a need to make a split-second decision. What the Miller court seems to have had in mind was the need for the social worker to act in a matter of hours or minutes. Nevertheless, the Miller court held that the nature of the situation faced by the social worker mandated proof of something more than subjective deliberate indifference, and this holding seems to require the application of a similar standard here.
 
 
 35
 We must thus attempt to determine exactly what Miller required. The appellants have seized upon the phrase "a level of gross negligence or arbitrariness that indeed `shocks the conscience.'" Id. at 375-76. The Miller court used this phrase as one part of its explanation of the ground for affirming a grant of summary judgment for the social worker, and we do not think that the phrase was intended as a precise articulation of the governing legal standard.[6]
 
 
 36
 So what did Miller require? We can approach an answer by noting what Miller did not demand. As noted, Miller expressly stated that the defendant social worker need not have acted with the purpose of causing the relevant harm, namely, removal of the children without good cause. Id. at 375. Nor did Miller suggest that the defendant had to have known that this harm was practically certain to result.[7] On the other hand, Miller demanded something more than deliberate indifference, which requires (in the sense applicable here) that a person consciously disregard "a substantial risk of serious harm." Farmer, 511 U.S. at 836, 114 S.Ct. 1970. Miller thus appears to have demanded proof of something less than knowledge that the harm was practically certain but more than knowledge that there was a substantial risk that the harm would occur. A simple way of putting this is that Miller mandated proof that the defendant was aware of more than a substantial risk — let us say a great risk — that there was no good cause for the removal of the children.
 
 
 37
 This reading of Miller is supported by Miller's discussion of Croft v. Westmoreland County Children & Youth Services, 103 F.3d 1123 (3d Cir.1997), in which parents were told that their daughter would be immediately removed from the home and placed in foster care unless the father left the home and avoided any contact with the daughter while an investigation was conducted to determine whether he was sexually abusing her. Id. at 1124. Noting that the defendant social worker in that case had no evidence of abuse except an anonymous tip based on hearsay and that the social worker had not even formed an opinion as to whether abuse had occurred, the Croft court held that the plaintiff parents and child had adduced sufficient evidence to establish a substantive due process violation. Id. at 1127. The court stressed that the defendant caseworker's conduct was "arbitrary" and completely without reasonable evidentiary support. Id. As the court stated in Miller:
 
 
 38
 [T]he social worker was acting solely on the basis of a sixth-level hearsay statement and had not personally formed an opinion as to whether abuse was likely. Breaking the parent-child bond under these circumstances, we held, was an arbitrary abuse of government power.
 
 
 39
 Miller, 174 F.3d at 375. Another way of putting the same point is that the social worker, in ordering the father's removal, consciously disregarded a great risk that there had been no abuse.
 
 
 40
 In summary, then, we understand Miller to require in a case such as the one before us, proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result if, knowing Smith was seriously injured, they moved Smith without support for his back and neck. On remand in the present case, we believe that the district court should apply this standard and instruct the jury accordingly if one is empaneled.
 
 V.
 
 41
 For the reasons explained above, this appeal is dismissed in part, and the order of the district court denying the appellants' motion for summary judgment is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation
 
 
 [2]
 Gatewood said that these remarks were made "after the ambulance got there," App. at 144a, but the defendants assert that the record does not show whether these alleged remarks were made when the paramedics were within earshot. Appellants' Br. at 5 n. 1. The defendants also note that neither Smith nor Roberta Brown, who was on the scene, recounted these remarks
 
 
 [3]
 While the appeal was pending, Smith died, and Joseph Ziccardi, Esq., the administrator of his estate, was substituted as the plaintiff
 
 
 [4]
 We reject the appellants' suggestion thatSaucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), somehow narrowed Johnson. Saucier never referred to Johnson and said nothing whatsoever about appellate jurisdiction. Nor do we read Brown v. Armenti, 247 F.3d 69 (3d Cir.2001), as supporting appellants' position. In Brown, we quoted Behrens v. Pelletier, 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), stating that Johnson held "that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." 247 F.3d at 77.
 
 
 [5]
 InKneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), which preceded Lewis, we held that deliberate indifference sufficed in a case in which state actors placed the plaintiff in a dangerous situation and the plaintiff was harmed by a nongovernmental actor. The case before us is not a "state created danger" case and is not governed by Kneipp.
 
 
 [6]
 The phrase is not well suited for that purpose. "[A]rbitrariness" is a general requirement for a substantive due process violation, seeLewis, 523 U.S. at 846, 118 S.Ct. 1708, not a specification of a precise degree of intent. And "gross negligence" is a lower level of intent than even tort-law recklessness, which is, in turn, lower than criminal-law recklessness or subjective deliberate indifference. Id. at 849, 118 S.Ct. 1708.
 
 
 [7]
 Compare Model Penal Code § 2.02(2)(b) (a person acts "knowingly" with respect to a result if the person is aware that the result is "practically certain" to occur). In Farmer v. Brennan, 511 U.S. 825, 839, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court referred to the Model Penal Code's definition of recklessness, and therefore reference to the Model Penal Code's carefully constructed categorization of intent is appropriate here.