

2006 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

7-6-2006

# Robinson v. Hartzell Propeller

Precedential or Non-Precedential: Precedential

Docket No. 04-3379

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Robinson v. Hartzell Propeller" (2006). *2006 Decisions*. Paper 672.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/672

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3379

———

MICHAEL ROBINSON, Individually,
and as Parent and Natural Guardian of
Jennifer Robinson and Matthew Robinson;
WENDY ROBINSON, Individually,
and as Parent and Natural Guardian of
Sarah Kelley and Samantha Kelley

v.

HARTZELL PROPELLER, INC.;
NEW ENGLAND PROPELLER SERVICE, INC.;
COLUMBIA AIRCRAFT SERVICE, INC.;
TEXTRON LYCOMING RECIPROCATING
ENGINE DIVISION, A DIVISION
OF AVCO CORPORATION;
TEXTRON, INC.; AVCO CORPORATION

Hartzell Propeller, Inc.,

Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 01-cv-05240)
District Judge: Honorable Jan E. DuBois

———

Submitted Under Third Circuit LAR 34.1(a)
June 12, 2006

Before: FISHER, GREENBERG and
LOURIE,[*] *Circuit Judges.*

(Filed: July 6, 2006)

Patrick J. O'Connor
Ann T. Field
Cozen & O'Connor
1900 Market Street, 4th Floor
Philadelphia, PA 19103
  *Attorneys for Appellant*

Bradley J. Stoll
The Wolk Law Firm
1710-12 Locust Street
Philadelphia, PA 19103
  *Attorney for Appellees, Michael Robinson*
  *and Wendy Robinson*

———————————————

[*]The Honorable Alan D. Lourie, United States Circuit
Judge for the Federal Circuit, sitting by designation.

J. Bruce McKissock
McKissock & Hoffman
1818 Market Street
Philadelphia, PA 19103
    *Attorney for Appellee, New England*
    *Propeller Service, Inc.*

————

OPINION OF THE COURT

————

FISHER, *Circuit Judge*.

In this complex products liability case involving the tragic crash of a small passenger aircraft, we consider primarily the following issue of law: whether we may exercise appellate jurisdiction under the collateral order doctrine to review the denial of a motion for summary judgment on the basis that a statute of repose was inapplicable. We conclude that the District Court's order does not fall under the collateral order doctrine and will accordingly dismiss the appeal for lack of appellate jurisdiction.

I.

On August 8, 1974, Hartzell manufactured the "Y"-shank aluminum propeller that eventually made its way onto a Mooney M20E aircraft. That aircraft was subsequently purchased by Wendy and Michael Robinson. Twenty-five years later, on August 15, 1999, the propeller fractured mid-flight, causing the

3

aircraft to crash. Both Wendy and Michael suffered extensive injuries: Wendy suffered a broken back, breast bone, and left foot, while Michael fractured his spine, rendering him a paraplegic. The Robinsons thereafter brought suit against Hartzell under theories of negligence and products liability.[1]

The General Aviation Revitalization Act ("GARA")[2] contains a statute of repose that generally bars suits against airplane manufacturers brought more than eighteen years after the delivery date to an initial purchaser of the aircraft. *See* 49 U.S.C. § 40101 note.[3] The Robinsons, however, allege that they

---

[1]The Robinsons also sued New England Propeller Service, a company that inspected and serviced the propeller in 1989, for negligence. That claim is not at issue in this appeal.

[2]Pub. L. No. 103-298, 108 Stat. 1552 (1994), amended by Act of Pub. L. No. 105-102, § 3(e), 111 Stat. 2216 (1997).

[3]Section 2(a) of GARA provides as follows:

(a) IN GENERAL.--Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred--

are entitled to bring their suit under an exception to the GARA statute of repose because Hartzell made several material

> (1) after the applicable limitation period beginning on--
>> (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or
>> (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or
>
> (2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

49 U.S.C. § 40101 note § 2(a). Section 2(d) of the Act states that "the section supersedes any State law to the extent that such law permits a civil action described in subsection (a) to be brought after the applicable limitation period for such civil action established by subsection (a)." *Id*. note § 2(d). Section 3 of the Act defines the "limitation period" as "18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft." *Id*. note § 3(3).

5

misrepresentations in connection with obtaining a type certificate for the propeller at issue from the Federal Aviation Administration ("FAA").[4] *Id.*

Federal law requires propeller manufacturers to obtain a type certificate from the FAA. *See id.* § 44704. The purpose of that process is to ensure that the propeller has been designed and

_____

[4] The specific exception at issue in this case is contained within section 2(b)(1) of the Act:

> (b) EXCEPTIONS.--Subsection (a) does not apply--
> (1) if the claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to the harm which the claimant allegedly suffered.[.]

49 U.S.C. § 40101 note § 2(b)(1).

manufactured properly, performs properly, and meets FAA minimum standards. *See id.* Some manufacturers are able to grant themselves a type certificate through the FAA's Delegated Opinion Authority ("DOA") process. DOA status grants to a designated engineering representative ("DER") the ability to "assume the FAA's role and certify a part." (App. 16-17, 373.) Following certification, an entity with DOA also "is responsible to ensure that the product design is in accordance with the regulations and has no characteristics which may detract from flight safety." Service difficulties, such as a failure, malfunction, or defect in any part, including "propeller blade . . . structural failure," are to be "reviewed, reported, and resolved." 14 C.F.R. § 21.3(c)(5).

In 1963, Hartzell submitted an application for type certification to the FAA for the propeller and aircraft combination at issue – the HC-C2YK-1/7666-2 Hartzell propeller installed on the Lycoming IO-360-AIA powered Mooney M20E airplane.[5] In connection with its initial

_____

[5]There is some confusion in the record as to whether Hartzell had DOA status at the time the application was submitted in 1963. Hartzell claims that it received DOA status in 1967. (App. 17.) The disagreement over when Hartzell received DOA status does not seem to be material to the ultimate disposition of the case. It is relevant, however, to the Robinsons' argument that Hartzell continued to abuse its DOA authority after certification was issued "by concealing the vibration problem and leading the FAA to believe that the cause of the frequent propeller failures were other than what Hartzell

7

application, Hartzell conducted a vibration test of the propeller/engine/aircraft combination the week of July 8, 1963. That test measured the stresses (measured in pounds per square inch (psi)) placed on the propeller at different speeds (measured in revolutions per minute (rpm)) at four different flight conditions: (1) take-off/climb at full throttle; (2) level flight at full throttle; (3) level flight with throttle set at 24-inch manifold pressure; and (4) static flight at full throttle. (App. 247-48.) With regard to these tests, the report stated the following:

> The peak stress at 2230 RPM reached a value of 4800 psi for the 24 inch Hg manifold setting, which is approximately the allowable value. Since this engine has no dampers which can wear and cause higher stresses, the probability of this value being reached or exceeded in service seems remote. There appears to be no necessity to placard against operation in the 2200-2300 RPM range.

> **\*\*\*\***

> The HC-C2YK/7666-2 propeller is considered satisfactory vibrationwise when installed on the IO-360 Lycoming engine without restrictions.

---

knew them to be." (App. 18.)

8

(App. 244-45.)

The Robinsons contend that this statement in the report contains three misrepresentations. First, the Robinsons contend that the peak stress was not approximately equivalent to the allowable value, but rather exceeded the allowable value. The Robinsons cite to a set of graphs that were contained in Engineering Report No. 213 that demonstrate that allowable vibratory stress limits were exceeded at three different points.[6] Second, the Robinsons contend that the lack of vibration dampers on the Lycoming engine would increase, rather than decrease, the stress on the propeller. They point to a 1972 engineering report in which Hartzell recommended "the use of [a] dampered engine" to decrease the chances of propeller failure. (App. 553-54.)[7] Finally, the Robinsons argue that there was a necessity to placard against operation at certain speeds because vibratory peak stresses exceeded FAA permissible limits. When the type certification was first issued, the type certification data sheet included a note requiring owners of the

---

[6]Although somewhat unclear from the briefs, it seems as if the graphs in Engineering Report No. 213 were not turned over to the FAA.

[7]The District Court concluded that this second statement was not a misrepresentation. The Court stated, however, that its ruling was without prejudice to the Robinsons' right to offer additional evidence at trial to argue that Hartzell knew that vibration dampers lessened the stresses imparted to the propeller. (App. 36-37 n.8.)

9

Mooney M20E to mark their tachometers between 2000 and 2350 rpm. Because of some early propeller tip failures, the FAA issued Airworthiness Directive ("AD") 65-12-13,[8] which placed further rpm restrictions on the propeller/engine combination and required an addendum to the airplane flight manual. (App. 559.) In addition, the FAA issued another AD in 1977, which required additional rpm restrictions.

The Robinsons also assert that Hartzell continued to make knowing misrepresentations and omissions regarding the propeller at issue following FAA certification of the propeller/undamped engine combination. As noted above, Hartzell had a continuing obligation under its DOA status to comply with the reporting requirements of 14 C.F.R. § 21.3. According to the Robinsons, "Hartzell's continuing airworthiness measures, approved through its DOA, did not resolve the illegal vibratory stresses disclosed by report 213 and did not disclose the excessive vibrations to the FAA." (Appellee's Br. at 7.) In fact, there have been approximately forty prior blade failures involving the same propeller/engine combinations as the one at issue. (*See* App. 18-19.) The Robinsons essentially argue that Hartzell on several occasions

---

[8]An AD is a legally enforceable rule that applies to, *inter alia*, aircraft and propellers. *See* 14 C.F.R. § 39.3. The FAA issues an AD if two requirements are satisfied: (1) an unsafe condition exists in the product, and (2) the condition is likely to exist or develop in other products of the same type design. *Id.* § 39.5. Anyone who operates an aircraft is required to comply with an applicable AD. *Id.* § 39.7.

blamed other factors – particularly pilot error – instead of disclosing that there was a propeller/engine vibration problem. (*See* App. 596, 621, 625, 629.)

Following the completion of discovery, Hartzell brought a motion for summary judgment contending that the suit was barred by the eighteen-year statute of repose enacted under GARA, 49 U.S.C. § 40101 note § 2(a). The District Court agreed with the Robinsons that material issues of fact existed as to whether the GARA exception applied and denied Hartzell's motion. Hartzell filed a timely appeal and urges us to reach the merits of the District Court's decision under the collateral order doctrine.

II.

Our jurisdiction as an appellate court extends under 28 U.S.C. § 1291 over a "final order" of a district court. An order is "final" when it "terminates the litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined." *Richerson v. Jones*, 551 F.2d 918, 922 (3d Cir. 1977) (quoting *St. Louis, Iron Mountain and S. Ry. Co. v. S. Express Co.*, 108 U.S. 24, 28-29 (1883)). In most cases, a denial of a motion for summary judgment does not qualify as a final order because, "far from finally deciding a case, it is a decision to permit litigation to continue." *Hamilton v. Leavy*, 322 F.3d 776, 782 (3d Cir. 2003) (citation omitted).

In *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541 (1949), however, the Supreme Court explained that § 1291 is to be

11

given a "practical rather than a technical construction," and that there is a "small class" of non-final orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546; *see also Dotzel v. Ashbridge*, 438 F.3d 320, 323 (3d Cir. 2006); *Bell Atlantic-Pa., Inc. v. Pa. Pub. Util. Comm'n*, 273 F.3d 337, 342 (3d Cir. 2001); *In re Ford Motor Co.*, 110 F.3d 954, 958 (3d Cir. 1997). *Cohen* and its progeny have been interpreted to permit the immediate appeal of an otherwise non-final collateral order if the order: (1) conclusively determines a disputed legal question, (2) resolves an important issue completely separable from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. *Bell Atlantic*, 273 F.3d at 342.

The Supreme Court has referred to the collateral order doctrine as a "narrow exception" that contains "stringent" requirements. *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). Strict construction of the doctrine is grounded on "the longstanding congressional policy against piecemeal appeals that underlies the final judgment rule." *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 324-25 (3d Cir. 1999). To prevent the unwarranted expansion of the doctrine, "the issue of appealability under § 1291 is to be determined for the entire category to which a claim belongs, without regard to the chance that the litigation at hand might be speeded, or a 'particular injustic[e]' averted by prompt appellate court litigation." *Digital Equip.*, 511 U.S. at 868; *see We, Inc.*, 174 F.3d at 325 ("This approach reflects the Court's insistence that

12

the finality requirement of § 1291 must not be reduced to a case-by-case determination.").  Thus, case-by-case considerations such as whether the litigation will be expedited by immediate review, or whether an erroneous ruling will incur increased expenses, are not factors that can justify review under the collateral order doctrine.  *Bell Atlantic*, 273 F.3d at 343.

Moreover, simply characterizing a right as an irreparable entitlement not to stand trial is insufficient for an appeal to fall under the collateral order doctrine, as "virtually every right that could be enforced appropriately by pretrial dismissal might loosely be described as conferring 'a right not to stand trial.'" *Digital Equip.*, 511 U.S. at 873.  As the Supreme Court has pointed out, the collateral order doctrine is exceedingly narrow because numerous adverse pretrial rulings cannot be completely remedied following final judgment:

> Even as they have recognized the need for immediate appeals under § 1291 to vindicate rights that would be "irretrievably lost" if review were confined to final judgments only, our cases have been at least as emphatic in recognizing that the jurisdiction of the courts of appeals should not, and cannot, depend on a party's agility in so characterizing the right asserted.  This must be so because the strong bias of § 1291 against piecemeal appeals almost never operates without some cost.  A fully litigated case can no more be untried than the law's proverbial bell can be unrung, and almost every pretrial or trial order might be called "effectively unreviewable" in the

13

sense that relief from error can never extend to rewriting history. Thus, erroneous evidentiary rulings, grants or denials of attorney disqualification, and restrictions on the rights of intervening parties, may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment; and other errors, real enough, will not seem serious enough to warrant reversal at all when reviewed after a long trial on the merits. In still other cases, an erroneous district court decision will, as a practical matter, sound the "death knell" for many plaintiffs' claims that might have gone forward if prompt error correction had been an option. But if immediate appellate review were available every such time, Congress's final decision rule would end up a pretty puny one, and so the mere identification of some interest that would be "irretrievably lost" has never suffered to meet the third *Cohen* requirement.

*Id.* at 872 (citations omitted).

We have not yet addressed whether an order denying summary judgment on a statute of repose defense qualifies as a collateral order under *Cohen* and its progeny. Each party has offered competing analogies in support of their respective positions. The Robinsons assert that the order is not appealable because we have explicitly held that defendants cannot appeal from a pre-trial order denying a statute of limitations defense. *See Bell-Atlantic*, 273 F.3d at 345-46. In contrast, Hartzell

14

argues that a decision on a statute of repose is more akin to a decision denying an assertion of qualified immunity, which is appealable to the extent it touches upon an issue of law. *See Hamilton*, 322 F.3d at 782; *Giuffre v. Bissell*, 31 F.3d 1241, 1245 (3d Cir. 1994).

A review of our caselaw confirms that the collateral order doctrine has been applied only to a narrow universe of rights primarily rooted in constitutional or statutory provisions or a competing public policy rationale. *See* 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3914.6, at 531 (2d ed. 1992) ("The theory that some rights are designed to protect against the burdens of trial and support appeal from a refusal to dismiss . . . is likely to be limited narrowly."). The essential question that must be answered is the nature of the right to be protected. In cases where the collateral order doctrine is applied, the interest at stake is so important that it is comparable to an immunity from suit that cannot be remedied unless immediate appellate review is taken. *Id.*

For example, in *Abney v. United States*, 431 U.S. 651 (1977), the Supreme Court held that a criminal defendant could appeal immediately the district court's denial of a motion to dismiss on the ground that the indictment violated double jeopardy protections. *Id.* at 659. The Court explained that the particular Fifth Amendment right at issue was a constitutional right "not to face trial at all," *id.* at 662 n.7, which would be forever lost if the defendant was forced to go to trial: "[T]here can be no doubt that such orders constitute a complete, formal and, in the trial court, final rejection of a criminal defendant's

15

double jeopardy claim. There are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee." *Id.* at 660. Similarly, in *Helstoski v. Meanor*, 442 U.S. 500 (1979), the Court held that the denial of a motion to dismiss an indictment premised on the Speech and Debate Clause of the Constitution was subject to immediate appellate review because that Clause was designed to protect Congressmen from being exposed to liability for actions taken on the floor of the legislature. *Id.* at 508; *see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993) (holding that entities claiming to be "arms of the state" may appeal an order denying Eleventh Amendment immunity under the collateral order doctrine); *Stack v. Boyle*, 342 U.S. 1 (1951) (permitting immediate appeal of denial of motion to reduce bail on grounds that it was an excessive penalty in violation of Eighth Amendment). The Court has also determined that denials of absolute and qualified immunity serve compelling public ends which would be irretrievably lost if officials were forced to go to trial. *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (holding that denial of absolute immunity immediately was appealable because immunity was a "functionally mandated incident of the President's unique office, rooted in the . . . separation of powers and supported by our history"); *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985) (concluding in the qualified immunity context that an "essential attribute" of freedom from suit for past conduct that did not violate a clearly established right was an "entitlement not to stand trial or face the other burdens of litigation," which could otherwise impede the official's discretionary actions).

16

In the vast majority of cases, our Court and the United States Supreme Court have rejected the application of the collateral order doctrine to non-final orders. In fact, the narrow scope of the collateral doctrine might be better understood by examining those orders from which courts have held that an immediate appeal may not be taken. For example, courts have held that decisions denying the following defenses were not appealable under the collateral order doctrine:

- an order denying a motion to dismiss for lack of personal jurisdiction, *Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988);

- an order denying a motion to dismiss on the grounds that an extradited person was immune from civil process, *id.*;

- a defense that a suit was barred by a prior settlement or release, *Digital Equip.*, 511 U.S. at 869 (1994); *Transtech Indus., Inc. v. Z Septic Clean*, 5 F.3d 51, 58 (3d Cir. 1993);

- a defense asserting *Noerr-Pennington* immunity to suit, *We, Inc.*, 174 F.3d at 326 (3d Cir. 1999);

17

- a decision denying both statute of limitations and res judicata defenses, *Bell-Atlantic*, 273 F.3d at 345-46;

- a decision denying dismissal of an indictment for an alleged violation of Federal Rule of Criminal Procedure 6(a), which forbids the disclosure of secret grand jury information, *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799-800 (1989);

- a decision denying effect to a contractual choice-of-venue provision, *Lauro Lines, S.R.L. v. Chasser*, 490 U.S. 495 (1989).

The key consideration in each of these cases was whether the claimed right sought to be protected was characterized as a right to immunity from suit or a defense to liability. *We, Inc.*, 174 F.3d at 326. In each decision enumerated above, the courts characterized the defenses as defenses to liability, which may be considered following a final judgment. *See*, *e.g.*, *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 269 (1982) (stating that there is "a crucial distinction between a right not to be tried and a right whose remedy requires the dismissal of charges").

Two of the decisions referenced above, *We, Inc.* and *Bell-Atlantic*, are particularly instructive to our analysis of the present

18

case. In *We, Inc.*, the plaintiff brought suit after the City of Philadelphia issued a cease operations order to the plaintiff to shut down two adjacent businesses near the University of Pennsylvania ("Penn") Dental School without first providing the plaintiff with notice or an opportunity for a hearing. 174 F.3d at 324. The plaintiff brought suit against both the City and Penn, arguing that it was deprived of property without due process of law. The district court denied the motion for summary judgment filed by Penn, which had claimed immunity for some of its actions under the *Noerr-Pennington* doctrine. That doctrine confers immunity from liability under the First Amendment for conduct resulting from petitioning a governmental body. *Id.* at 327. On appeal, Penn asserted that we could exercise jurisdiction under the collateral order doctrine because *Noerr-Pennington* immunity was akin to absolute and qualified immunity. We rejected that argument, finding that "the Petition Clause of the First Amendment neither enjoys 'special First Amendment status' nor confers an 'absolute immunity' for privilege." *Id.* We explained that although the *Noerr-Pennington* doctrine bestows immunity from liability to prevent First Amendment rights from being chilled, it does not confer immunity from suit.

Key to our decision in *We, Inc.* was the distinction between immunity involving a public official and immunity involving a private defendant. We adopted the analysis from the Seventh Circuit in *Segni v. Commercial Office of Spain*, 816 F.2d 344 (7th Cir. 1987), which distinguished *Noerr-Pennington* immunity from qualified, absolute, and "state action" immunity

19

on the ground that the latter doctrine[s] "had been interpreted to create an immunity from suit and not just from judgment – to spare state officials the burdens and uncertainties of the litigation itself as well as the cost of an adverse judgment." The possibility that the "burdens of suit . . . might deter [public officials] from vigorous execution of their office [was] a consideration missing in the case of the private defendant."

174 F.3d at 329 (citation omitted). We agreed with the distinction drawn by *Segni* between public official immunity and private party immunity, noting that we had been "unable to find any case holding that the burden of litigation on a private defendant justifies an immunity from suit as well as a defense to liability." *Id.* As a result, we concluded that the interests protected by the *Noerr-Pennington* doctrine could be fully vindicated by an appeal following a trial. *Id.* at 330.

In *Bell-Atlantic*, we determined that a decision denying a statute of limitations defense was not immediately appealable under the collateral order doctrine. In so doing, we again discussed the distinction between an immunity from suit and a defense to liability, explaining that "[t]he fact . . . that a defense may warrant pre-trial dismissal is not dispositive of whether it is immediately appealable." *Bell-Atlantic*, 273 F.3d at 345. Rather, the key inquiry is the nature of the right at issue and whether that right would be forfeited if not vindicated prior to trial. Following that dichotomy, we offered the following explanation of why a decision denying a statute of limitations

20

defense was not immediately appealable under the collateral order doctrine:

> Statutes of limitation are not guarantees that suit and trial will not occur on untimely claims. Limitations periods are designed to foreclose the potential for inaccuracies and unfairness brought about by a finding of liability based on stale evidence. This interest is not in defending against old claims, but an interest in not being held ultimately liable on that old claim based on old, less reliable evidence. Such an interest is not irretrievably lost if a party must wait until after final judgment to appeal the adverse ruling and to vindicate the right to be free from liability.

*Id.* at 346. Thus, we held that the statute of limitations defense could be effectively reviewed on appeal from a final judgment. *Id.*

In arguing that a statute of repose should be treated like qualified immunity, Hartzell relies heavily upon the Ninth Circuit's decision in *Estate of Kennedy v. Bell Helicopter Textron*, 283 F.3d 1107 (9th Cir. 2002). In *Kennedy*, the Ninth Circuit determined that it could exercise appellate jurisdiction over a decision denying a motion to dismiss under the GARA statute of repose. The majority opinion compared the GARA statute of repose to a form of qualified immunity and concluded that "the GARA statute of repose . . . creates an explicit statutory right not to stand trial which would be irretrievably lost should [the defendant] be forced to defend itself in a full trial."

21

*Id.* at 1110. The majority rejected the plaintiff's argument that the statute of repose was more akin to a statute of limitations, and rendered a conclusory holding that the right conferred under the statute of repose was a right "to be free from the burdens of trial." *Id.* at 1111.

A dissenting opinion by Judge Paez, however, is more in line with Supreme Court and Third Circuit precedents. The dissent noted that the statute of repose language in GARA, which provides that "no civil action . . . may be brought," was very similar to the language used in the federal default statute of limitations, 28 U.S.C. § 1658.[9] The dissent explained that, "in

[9]Section 1658 provides as follows:

(a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.
(b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--
   (1) 2 years after the discovery of the facts constituting the violation; or

22

employing traditional text for statutes of limitations, Congress intended [in GARA] only to confer a defense to liability, not immunity from suit and a collateral appeal right." *Kennedy*, 283 F.3d at 1115 (Paez, J., dissenting). In addition, Judge Paez surveyed the historical rationale for applying the collateral order doctrine to qualified immunity decisions. He found that the qualified immunity exception was rooted in preventing the social costs of subjecting governmental entities to broad-ranging discovery. These societal costs, Judge Paez pointed out, "are conspicuously absent from" the GARA statute of repose defense: "GARA's purpose is not to relieve general aviation manufacturers from social costs, but rather, solely from the economic costs of product liability claims – the same type of economic costs faced by any defendant in an action alleging tortious conduct." *Id.* at 1114 (Paez, J., dissenting).

In light of the case law, there are four primary reasons why the District Court's ruling denying application of the GARA statute of repose should not be appealable under the collateral order doctrine. First, the interest protected by a statute of repose is much more similar to a statute of limitations than to a grant of qualified immunity. Although we have noted that the interest protected by a statute of repose is somewhat different from that protected by a statute of limitations, *see Woessner v. Air Liquide, Inc.*, 242 F.3d 469, 472 n.1 (3d Cir. 2001), both are designed primarily to protect private parties from liability on

---

(2) 5 years after such violation.

28 U.S.C. § 1658.

23

stale claims. As Judge Paez pointed out in his dissent in *Kennedy*, the fact that the language used in the GARA statute of repose was similar to the federal catch-all statute of limitations in 28 U.S.C. § 1658 evinces a Congressional intent that the two provisions would receive similar treatment in the collateral order context.

Second, as noted in *We, Inc.* and in the dissenting opinion in *Kennedy*, there is a clear difference between an immunity granted to a public official and an immunity granted to a private defendant. We have recognized in the former context that an order surrounding an immunity decision is immediately appealable under the collateral order doctrine to ensure that public officials are not deterred from vigorously carrying out the discretionary functions of their office. We have not done so in the latter because the same public policy rationale does not extend to whether a private party defendant should be forced to wait until after a final judgment to remedy an incorrect decision.

Third, the GARA statute of repose is not a pure immunity because it contains exceptions under which immunity does not attach. One such exception, that a knowing misrepresentation renders the statute of repose inapplicable, does not have an analogue in the context of qualified immunity, in which there are no "exceptions" to granting immunity if a public official has not violated a clearly established right. Holding to the contrary in this case would be inimical to our admonition "that the finality requirement of § 1291 must not be reduced to a case-by-case determination." *We, Inc.*, 174 F.3d at 325.

24

Finally, even if we were to hold that a statute of repose is the functional equivalent of a decision on qualified immunity, the *Cohen* factors militate against recognizing appellate jurisdiction because the applicability of the statute of repose is intertwined with a decision on the merits. This fact clearly distinguishes the present case from *Kennedy*. There, the Ninth Circuit was faced not with a factual dispute as to the applicability of the § 2 GARA exception, but with a legal issue: which of two undisputed dates triggered the running of the GARA limitations period. Here, the District Court found that there was a factual dispute relating to the § 2 exception. That determination is similar to a finding in the qualified immunity context that there are disputed facts relating to the immunity issue. In that context, we have exercised appellate jurisdiction under the collateral order doctrine to review a pre-trial denial of immunity "only to the extent that it raises questions of law." *Hamilton*, 322 F.3d at 782; *see Giufffre*, 31 F.3d at 1245 ("[A]n order denying qualified or absolute immunity, *to the extent that the order turns on an issue of law*, is immediately appealable under the collateral order doctrine.") (emphasis added and citation omitted). The reason is that such a situation is not "completely separate from the merits"; in other words, the merits issue is intertwined with the immunities issue.

The same result applies in this case. The District Court determined that there is an issue of fact regarding whether Hartzell misrepresented information to the FAA.[10] Not only is

---

[10]We are precluded from reviewing at this stage of the proceedings the District Court's identification of facts that are

25

a determination on that issue relevant to the underlying merits of the claim, it is also important to determine whether the § 2 GARA exception applies. Thus, in addition to not exercising appellate jurisdiction over this appeal in the immunity context, we should not do so because the issue is not separable from the merits.

When all of these factors are considered in the context of our historical reluctance to expand the scope of the collateral order doctrine, it becomes clear that we should decline to exercise jurisdiction over Hartzell's appeal.

IV.

A statute of repose simply does not implicate the same public policy concerns as a denial of absolute or qualified immunity. In addition, the decision on whether the statute of repose applies in this particular case is intertwined with a decision on the merits. There exists a genuine issue of material fact as to whether the GARA exception applies, which would preclude our consideration of the appeal at this time under the *Cohen* factors and our jurisprudence in the area of qualified immunity. For these reasons, we decline to allow an interlocutory challenge to the decision denying the motion to dismiss under the GARA statute of repose and will dismiss this appeal.

---

subject to genuine dispute. *See Hamilton*, 322 F.3d at 782 (citing *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 59, 61 (3d Cir. 2002)).